Lomoe, Administrator, Respondent, vs. Superior Water, Light and Power Company, Appellant.

*September 13—October 3, 1911.*

*Negligence causing death: Electric wires: Evidence: Opinion as to cause of death: Immaterial errors: Notice of dangerous conditions: Instructions to jury: Damages for death of boy.*

1. In an action for death of a boy, alleged to have been caused by electric current transmitted to a guy wire from defendant's primary lighting wires, evidence that boys of the neighborhood played about the guy wire and swung upon it, even though not sufficient to prove a general custom, was admissible upon the question of defendant's negligence in allowing the wire to remain in a dangerous condition, in connection with' other evidence tending to show that for at least two months before the accident the conditions with respect to contact between the wires were such as to charge defendant with notice thereof.

2. The opinion of an expert, given in reply to a hypothetical question, that the cause of the boy's death was an electric shock, was not prejudicial to defendant, even if the question was objectionable as calling for a deduction proper to be made only by the jury, where from the undisputed facts no other inference could be drawn than that the boy was killed by an electric current communicated to the guy wire from the lighting wires.

3. Refusal to submit for special verdict questions relating to merely evidentiary matters is not error.

4. Thus, in this case, it was not error to refuse to submit questions as to whether some person not in defendant's employ had, shortly before the accident, placed one of the primary wires under the insulator in such a position that the current might be transmitted to the guy wire and whether that was the proximate cause of the accident, especially since the jury were charged that defendant was not bound to anticipate such an act and could not be found negligent because of the position of its wire unless it had been there for so long a time that in the exercise of ordinary care defendant ought to have known of the condition.

5. The evidence (stated in the opinion) is *held* to sustain a finding by the jury to the effect that defendant was chargeable with notice of the condition of the wires.

6. It was proper to charge the jury in such case that danger in the use of electricity is imminent and lurking in character; that a high degree of watchfulness for the prevention of accidents is imposed upon persons handling electric currents; and that such watchfulness should take into account the acts of strangers and of the public generally.

7. An award of $2,500 (reduced from $3,000 by the trial court) for death of a boy ten years of age is *held* not so excessive that it should be disturbed. MARSHALL, J., dissents.

APPEAL from a judgment of the circuit court for Douglas county: FRANK A. Ross, Circuit Judge. *Affirmed.*

This is an appeal from a judgment for damages in an action by plaintiff as administrator for the death of his son, alleged to have been caused by the negligence of the defendant. The negligence charged is the maintenance of defendant's wires, carrying large and powerful currents of electricity, so that said wires were resting upon and in contact with other wires located upon a shorter pole than the pole of the defend-

ant standing at the corner of Hennepin avenue and Third street at Itasca station, city of Superior, and which wires on the short pole were resting upon and in contact with a guy wire on said pole, which guy wire became charged and conveyed the current to the plaintiff's son, causing his death. Deceased was ten years of age, and is alleged to have been killed about 9 p. m. August 6, 1910, by coming in contact with the guy wire charged as before stated. The jury returned the following verdict:

"(1) Was plaintiff's son, Orrin Lomoe, killed by electric shock resulting from contact with the guy wire mentioned in the evidence? A. Yes.

"(2) Was the defendant guilty of negligence in maintaining its electric light wires at the place of the accident in the manner in which the same were maintained? · A. Yes.

"(3) If you answer question 2 'Yes,' was such negligence the proximate cause of the death of plaintiff's son, Orrin Lomoe? A. Yes.

"(4) What amount of money will compensate plaintiff for the financial loss resulting from the death of his son? A. $3,000."

The plaintiff moved for judgment on the verdict and the defendant to have the verdict set aside and for a new trial, and on these motions the court ordered that the motion of the defendant be granted unless the plaintiff file a stipulation remitting the sum of $500 from the verdict and consent to take judgment for $2,500 and costs, in which event defendant's motion should be denied. The plaintiff having filed a stipulation to remit $500 from said verdict and consented to take judgment for $2,500, it was ordered that judgment be entered in favor of the plaintiff for $2,500 and costs. Judgment was entered accordingly, from which this appeal was taken.

For the appellant there was a brief by *Luse, Powell & Luse,* and oral argument by *L. K. Luse.*

*W. P. Crawford,* for the respondent.

KERWIN, J.   There is little dispute upon the facts in this case.   Itasca station is in the eastern part of the city of Superior and is a place where trains are made up, and contains a group of residences with three or four hundred inhabitants. It is conceded for the purpose of the case that Third street runs east and west and Hennepin avenue north and south, crossing Third street at right angles.   The plaintiff and his deceased son lived near by.   On August 6, 1910, at 8:45 p. m., deceased went for a pail of water, and in going the usual course passed under the guy wire hereafter described. The boy brought the pail of water to the sidewalk near the guy wire, placed it on the walk, and his body was found under the guy wire near the walk.   In the northeasterly corner of the intersection of the streets named stood a telegraph or telephone pole known as the Omaha pole, being used by parties other than defendant and connected with the Omaha railroad. There were wires extending from buildings of the Omaha road north along Hennepin avenue to this pole and two wires extending west to residences.   There was one cross-arm upon this pole five feet in length, upon which were four pins and the wires fastened with insulators.   The wires attached to this cross-arm were twenty-six feet from the ground.   Two wires from the south stopped at this pole and were attached to the two pole pins, each about twelve inches from the center, one upon either side of the pole.   The other two insulators were near the ends of the cross-arm and about eighteen inches distant from the other two pins.   The cross-arm was on the west side of the pole, and a short wire called a pin wire was fastened to one of the pole pins and passed around the east side of the pole and fastened to the other pole pin in order to support the pins from the drawing of the wires extending from the pole south.   This pole had been in position for three years or more.   The ownership of it does not appear, nor does it appear who placed or maintained the wires upon it.

The defendant owned and maintained a line of poles ex-

tending north and south along the easterly side of Hennepin avenue. The two poles in said line standing nearest to the Omaha pole were about 113 feet apart—the one to the south fifty-eight feet and the one to the north fifty-five feet. This line of poles carried two cross-arms and wires thereon. On the lower cross-arm were three wires, two of which were primaries and the center one a neutral. The wires on the lower cross-arm were about twenty-eight feet eight inches above the ground on the pole north and about twenty-nine feet eight inches above the ground on the pole south, making the wires at the time they were put up about three feet, at the points of fastening, above the wires on the top of the cross-arm of the Omaha pole. The Omaha pole and the defendant's poles were in line.

The wires of the defendant attached to the lower cross-arm of defendant's poles mentioned were placed three years before the accident, and were put up so as to allow twenty-six inches sag between the two poles, and in the spring before the accident they were from six to ten inches above the cross-arm on the Omaha pole. It appears that three years before the accident some one, unknown, and without the consent of defendant, placed a guy wire upon the Omaha pole, fastening the guy wire at the top of the pole above the cross-arm, and tied this wire to defendant's pole standing fifty-five feet north at the height of five feet ten inches above the sidewalk. This guy wire passed down and near the pin wire where it passed around the back of the pole so it would touch the pin wire when pressed down. The defendant's primary wires carried 2,300 volts of electricity.

1. Error is assigned in the admission of evidence to the effect that the witness, a boy, had played around the guy wire and swung upon it, and that other boys had played around the wire and swung upon it. The evidence is that the boys generally swung on it—all the boys in Itasca. The objection to this evidence is that it does not appear that the defendant

had notice of such acts by the boys, and further that the evidence does not relate to a general custom.    It may well be that the evidence fell short of proving a general custom, but we think it was admissible upon the question of defendant's negligence in allowing the wire to remain in the dangerous condition in which the evidence tends to show it was, in view of its location and the habits of the boys in Itasca respecting it, and in view of the fact that the evidence was sufficient to carry the case to the jury on the point of notice sufficient to charge the defendant with responsibility for the condition of the wire.    One witness testified that two months before the accident he saw evidence of contact of defendant's wires with the guy wire; that he saw sparks or flickering of fire on the top of the pole to which the guy wire was attached; that he saw it several times and heard noise indicating contact.    The evidence also tends to show that such condition continued and was manifest when the guy wire was pressed down.

Three witnesses testified that two weeks before the accident they saw evidence of contact, describing the sparks and flickering near the top of the pole.    Without further discussion of the evidence we are convinced that for at least two months before the accident the condition was such as to warrant the jury in finding that the defendant was chargeable with notice.

2. Error is assigned in allowing Dr. Baird to answer the following question:

"Q. Doctor, assuming that on the night of this visit of yours to *Mr. Lomoe's* house this boy was ten years and three months of age; that previous to that time he had been in average good health, in perfect health; that he was an active boy; that about 8:45 o'clock on that same night he was sent by his father for a pail of water, and in returning he set the pail full of water down on the sidewalk close to a pole which carried electric light wires and to which a guy rope was attached that ran from this pole up to near the top of another pole which was twenty-six feet high; that this guy wire was about five feet above the sidewalk, and that within two feet

of the pole to which this guy wire was fastened there was a track, traveled path, and that about five or ten minutes after he was sent for the pail of water he was found by his father lying under the guy wire with his head towards the sidewalk and within two or three feet of the pole, his arm and legs ex-tended, and gasping; that his father picked him up and took him into the house; that his clothing was removed and he was put in a tub of hot water; that he was shortly afterward taken out of the tub and pounded on the back, and that then arti-ficial respiration was used, the arm movement, and continued for about twenty-five minutes and until you arrived and saw the boy.  Take that into consideration, and taking into con-sideration the condition of the boy's body as you found it and as you testified here, and taking into consideration your ex-perience as a physician and surgeon, state what in your opin-ion was the cause of the boy's death."

The witness answered: "I would say the cause of the death was electric shock." ·

The contention of the appellant is that the facts embraced within the question were not the subject of expert evidence; that the inferences to be deduced from such facts might as well be drawn by the jury as by the witness; and that the in-terrogatory called for an answer to the direct question put in issue by the pleadings and was not competent; that while Dr. Baird testified that he found burns on the deceased's hands and shoes, he could not tell whether such burns were caused by electricity or not; and that the only element in the question upon which the doctor would have any superior knowledge to any member of the jury was as to treatment of the boy after he was found gasping, by placing him in a tub of hot water and attempting artificial respiration, and that this would not throw any light upon the cause of his death, whether it was occasioned by electric shock or in some other manner.  Counsel for appellant cites us to the following au-thorities to sustain his contention: 17 Cyc. 41; *Knoll v. State,* 55 Wis. 249, 12 N. W. 369; *Trapp v. Druecker,* 79 Wis. 638, 48 N. W. 664; *Wiltse v. Tilden,* 77 Wis. 152, 156, 46 N. W.

665; *Veerhusen v. C. & N. W. R. Co.* 53 Wis. 689, 694, 11 N. W. 433; *Mellor v. Utica,* 48 Wis. 457, 4 N. W. 655; *Wylie v. Wausau,* 48 Wis. 506, 4 N. W. 682; *Tuttle v. Lawrence,* 119 Mass. 276; *Buxton v. Somerset P. Works,* 121 Mass. 446; *Meehan v. G. N. R. Co.* 13 N. Dak. 432, 101 N. W. 183; *Hunt v. Kile,* 98 Fed. 49; *New York E. Q. Co. v. Blair,* 79 Fed. 896; *Inland & S. C. Co. v. Tolson,* 139 U. S. 551, 11 Sup. Ct. 653.

Whether this question was proper is not free from difficulty, but we do not regard the answer prejudicial, even if the evidence was incompetent (a point we do not decide), because we think the jury from the evidence could have drawn no other inference than that the boy came to his death by an electric current communicated to him from the guy wire. It is suggested by counsel for appellant that he might have been killed by lightning, but there is no evidence to support such an inference. From the undisputed facts we think no other inference could be drawn than that he was killed by an electric current from the guy wire communicated to it from defendant's wire. This being so, the answer to the hypothetical question was wholly immaterial and could not have prejudiced defendant.

3. Error is assigned because the court refused to submit to the jury the following questions:

"(1) Did some person not in the employ of the defendant shortly before the accident place one of the defendant's primary wires under the insulator and in contact with the pin wire?

"(2) If you answer the above question 'Yes,' was this the proximate cause of the accident?"

The questions asked to be submitted were merely evidentiary and there was no error in refusing to submit them. *Swalm v. N. P. R. Co.* 143 Wis. 442, 445, 128 N. W. 62; *Anderson v. Sparks,* 142 Wis. 398, 125 N. W. 925. Moreover, the court charged upon the subject to the effect that de-

fendant was not bound to anticipate that any person would place its primary wire under the insulator (there being evidence that it was under the insulator at the time of the injury) in such manner as to come in contact with the pin wire, and that they could not find the defendant negligent because of the wire being there unless they found that it had been there for so long a time that defendant ought, in the exercise of ordinary care, to have known of the condition. The negligence of defendant was covered by the special verdict submitted, and no error was committed in refusing the request to submit the questions. *Sufferling v. Heyl & Patterson,* 139 Wis. 510, 121 N. W. 251; *Steber v. C. & N. W. R. Co.* 139 Wis. 10, 120 N. W. 502; *Palmer v. Schultz,* 138 Wis. 455, 120 N. W. 348; *Zimmer v. Fox River Valley E. R. Co.* 118 Wis. 614, 95 N. W. 957; *Blankavag v. Badger B. & L. Co.* 136 Wis. 380, 117 N. W. 852; *Ryan v. Oshkosh G. L. Co.* 138 Wis. 466, 120 N. W. 264.

4. It is claimed that the court erred in refusing to charge the jury as requested by appellant. These requests in effect asked the court to charge that plaintiff was not entitled to recover; that there was no evidence that the guy wire was dangerous, or that defendant had notice of its condition, or that there was any contact with defendant's wire; and that there was no evidence that the sagging of defendant's wires was the cause of the injury. These requests involve the question of the sufficiency of the evidence to make a case for the jury. We have already referred to some of the evidence tending to show that defendant was chargeable with notice of the condition of the wires. There is evidence that the wires had sagged some time before the injury to a point within six inches of the cross-arm on the Omaha pole, and that defendant had no system of inspection, only that its men while working or when not busy looked to see if there was anything wrong. Defendant's foreman testified that the last time he was over the line was in the spring or early summer, and that

was the time he noticed that the primary wires were six inches from the cross-arm. Whatever way the wire was brought under the insulator and the contact formed is not very material, since there is evidence to warrant the jury in finding that the condition had existed for such time as to charge the defendant with notice, and there is evidence that the sparks and sputtering noise at the top of the pole could have been caused in no other way than by coming through one of defendant's primary wires. The test made after the injury and while conditions remained the same showed that there was a contact, and that by pressing down on the guy wire the current passed into it from the defendant's primary wires. Respecting the cause of the boy's death, as before observed, we think no other inference could be drawn from the evidence than that he was killed by an electric shock from the guy wire. We are of opinion that no error was committed in refusing the requests to charge referred to.

5. Error is assigned upon the part of the charge which told the jury that danger in the use of electricity was imminent and lurking in character, and that a high degree of watchfulness for the prevention of accidents is imposed upon persons handling electric currents; that such watchfulness should take into account the acts of strangers and of the public generally. There was no error in this part of the charge. *Nagle v. Hake,* 123 Wis. 256, 101 N. W. 409; *Wilbert v. Sheboygan L., P. & R. Co.* 129 Wis. 1, 106 N. W. 1058; *Ryan v. Oshkosh G. L. Co.* 138 Wis. 466, 120 N. W. 264. The *Wilbert Case* was quite similar in facts to the case now before us, and this court said:

"The danger incident to the use of electricity is imminent and lurking in character, and a high degree of watchfulness for the prevention of accidents is imposed on persons handling it. . . . The watchfulness needed to prevent such accident should take into account the acts of strangers and the public generally."

The following parts of the charge are also complained of:

"You will consider the length of time the conditions as they are shown by the evidence to have existed at the time of the accident had continued prior to the time of the accident.

"And you will consider also the question as to whether or not the condition and location of the wires were such as that a person familiar with electric wires and knowing the characteristics of electricity being transmitted through wires ought, in the exercise of ordinary care, to have discovered or anticipated that the guy wire might become charged with electricity from defendant's primary wires or either thereof."

The complaint rests chiefly upon the assumption that there was not sufficient evidence to charge the defendant with knowledge of the condition of the wires. This point has been considered heretofore.

6. It is also insisted that the damages are excessive. The jury gave $3,000 damages and the court below reduced the verdict to $2,500. We do not feel justified in disturbing the judgment as to amount of damages fixed by the trial court.

We find no reversible error in the record.

*By the Court.*—The judgment is affirmed.

TIMLIN, J. I do not think the question which Dr. Baird was permitted to answer was proper, particularly under the circumstances presented here. The doctor had testified that from an examination of the wounds he could not say what caused death. It would not be proper in any case because it submits to the witness to make deductions from circumstantial evidence proper to be made only by the jury. On the question whether or not appellant has affirmatively shown that it was prejudiced by this ruling I concur in the opinion by Mr. Justice KERWIN. The expert evidence elicited by the question was cumulative. It was added to certain very persuasive circumstantial evidence, which latter seemed to exclude every other reasonable hypothesis than that the cause

of death was an electric shock from the guy wire. There was no evidence contradictory of this last.

MARSHALL, J. (*dissenting*). I disagree with my brethren only on whether the judgment is fatally excessive. To my mind that should be answered, very emphatically, in the affirmative. Much of what I said in my opinion in *Ludvigson v. Superior S. B. Co., post,* p. 34, 132 N. W. 621, applies to this case, but with added force because we have here the decision of the circuit judge that the verdict of the jury was fatally excessive. Doubtless it was not thought that it was characterized by passion or prejudice or any element of dishonesty, but was characterized by mistake of law, and perhaps of fact as well,—plainly by want of appreciation of the limit of rightful recovery being the pecuniary loss to the father, measured by his reasonable expectation, at the time of the son's death, of receiving pecuniary benefits from a continuation of the latter's life. I cannot think for a moment that the jury comprehended that at all.

I reach the conclusion stated because, as I view the case, it is wholly wanting in evidence to support the award of damages made, even as reduced by the trial court. The boy was ten years old. He was a child of ordinary attainments. The father had two other boys,—one nine and the other thirteen years of age, all by a first and deceased wife,—and one child by a second wife. The father was forty-one years of age and second wife twenty-nine. All members of the family were in good health. The father occupied a lucrative position and was in comfortable circumstances. There was no evidence to show that the deceased was specially inclined to assist his father, pecuniarily, or had any particular capability in that regard. There was no evidence showing, even remotely, that the father needed, or would probably need, pecuniary help from his son. The fact that there was a young second wife

and a child by her strongly suggests improbability of such help.

In view of the foregoing and the common knowledge that children, as a rule, are not pecuniarily helpful to their parents,—rather the contrary,—and no evidence that the boy in question was out of the ordinary in respect to probability of rendering pecuniary assistance to his father,—rather the contrary,—how can we say the latter had, at the time of the boy's death, reasonable expectation of such aid to the extent of $3,000 or $2,500?

This court in *Wiltse v. Tilden,* 77 Wis. 152, 46 N. W. 234, while overlooking somewhat the Code provision for protecting a litigant from being mulct in an excessive amount, with evident reluctance, sustained a verdict of $2,000 for the death of a young minor girl though there was undisputed evidence of dependency of the parent upon the girl's earnings; that she was receiving good wages; had fine prospects in that regard and was much devoted to the welfare of her mother, the beneficiary. As I have remarked, there is no evidence of the kind in this case.

This court has held repeatedly, that, ordinarily, some evidence is required to warrant any recovery, in a case of this kind, except for the balance of the period of minority. *Potter v. C. & N. W. R. Co.* 21 Wis. 372; *Ewen v. C. & N. W. R. Co.* 38 Wis. 613, 622; *Tuteur v. C. & N. W. R. Co.* 77 Wis. 505, 46 N. W. 897. In the latter case the court remarked: "Ordinarily parents expect no pecuniary benefits or advantages from their children after they become of age; hence, in case of the death of a child, it has been held necessary to show that the parent was in an indigent or dependent condition in order to recover." That doctrine was emphatically affirmed in *Thompson v. Johnston Bros. Co.* 86 Wis. 576, 57 N. W. 298, where an award of $700 was sustained on abundance of evidence showing reasonable expectation of

pecuniary benefits to the parent from the life of the child,. both during and after minority.

So it seems plain that the recovery in this case must be regarded as covering only the period of minority. That is, the jury awarded the beneficiary an equivalent of a payment of about $30 per month for that period, and the court cut it down to $25. If there is any evidence upon which to ground judgment on such basis I am unable to find it. I should say the recovery ought to be reduced by $1,500—probably more.

Much respect is, doubtless, given by my brethren to the fact that the trial court fixed the right of recovery at $2,500. I think that should not have any very significant weight because characterized by several errors of law. The learned circuit judge, evidently, did not appreciate the fact that, as the evidence stood, the recovery could not reach beyond the period of minority. Furthermore, he, evidently, did not appreciate the rule that, in letting an excessive recovery stand for a less amount, at the option of the plaintiff, such amount should be placed as low as an intelligent jury, properly instructed, in the exercise of sound judgment upon the evidence and the law applicable thereto, and appreciating the same, would be liable to place it. *Baxter v. C. & N. W. R. Co.* 104 Wis. 307, 80 N. W. 644; *Rueping v. C. & N. W. R. Co.* 116 Wis. 625, 93 N. W. 843; *Willette v. Rhinelander P. Co.* 145 Wis. 537, 558, 130 N. W. 853. I think the rule was reversed here. Further, I think the trial court did not appreciate that, even in such a case as this,—for the minority period,—the award cannot be properly placed at an arbitrary sum. It must be based on some common-sense view of the evidence as regards pecuniary loss to the beneficiary by the death complained of.

I think, further, that neither the jury nor the trial court appreciated that, whereas there is an increase in the cost of living, increase of wages and diminished purchasing power of money from the condition in former years, forming a sub-

stantial basis for the tendency to permit larger recoveries for injuries to or deaths of adults than formerly, the reverse is true in case of infants. The increased cost of living has diminished, greatly, the probability of a parent receiving pecuniary benefits from the life of his child during minority. Then there is the great change from the custom of the major part of the ordinary class to put their children to profitable employment at an early age and take the avails of their labor till majority, to the habit of not putting them to such employment till near majority, if at all, and of not taking the proceeds of their work; that being, in recent years, supplemented by stringent legislation, creating substantial disability to realize anything of a pecuniary nature from the labor of a minor prior to his seventeenth year. Sec. 1728a, Stats. (Laws of 1911, ch. 479). In view thereof, how can we say, in a case of this sort, that there is any ground for such a recovery as we have before us,—practically, on a present worth basis for the five years of legal permission to enjoy the wages of a son, of about $800 per year? Otherwise than under exceptional circumstances, in view of the law and custom of our time, there is no reasonable probability of a child being self-supporting and returning anything of a pecuniary nature to the parents. Evidence should be required to show the exceptional circumstances, if any. Here, as we have seen, the evidence rather negatives the existence of such circumstances. Yet it is said the beneficiary of the recovery had reasonable ground, at the time of the son's death, to expect pecuniary benefits by a continuation of his life for the next eleven years to the extent of some $25 per month, though he was substantially prohibited by law from having any benefit from the boy's engaging in a gainful occupation till the last five years of minority. I cannot agree to that.