# CHARLESTON.

MARTIN *v.* APPALACHIAN ELECTRIC POWER Co. *et al.*

(Nos. 6638, 6638-A)

Submitted April 29, 1930.   Decided May 6, 1930.
(Rehearing Denied May 29, 1930.)

*S. D. Stokes,* for Coal Corporation.

*Mohler, Peters & Kelly* and *Goodykoontz & Slaven,* for Power Company.

*Bailey & Shannon, W. E. Whitt* and *W. Scott Whitt,* for defendant in error.

WOODS, JUDGE:

This is an action in trespass on the case brought in the circuit court of Mingo county, by the administrator of the personal estate of Rosa Martin, deceased, against Appalachian Electric Power Company, a corporation, and Borderland Coal Corporation, a corporation, for the recovery of damages for the death of said Rosa Martin by electrocution in the coal camp of the coal company. The trial court instructed the jury to find for the plaintiff against both defendants, and the jury returned a verdict for $5,000. Both of the defendants prosecute error.

The Appalachian Electric Power Company is a public service utility engaged in the business of manufacturing and selling electric energy to purchasers and consumers. The Borderland Coal Corporation is a coal mining company with operations on Tug river at Borderland, in Mingo county, W. Va., and as a part of its operation owns the town site and houses where plaintiff's decedent lived and was killed.

Prior to June 1, 1928, the coal company manufactured its own electric current at its operations at Borderland, and transmitted the electric current so manufactured to and through its mines, buildings, and houses over a system of electric lines built, owned, and maintained by it. The wire on which Mrs. Martin was electrocuted was a part of this old installation. On or about April 26, 1928, the coal company entered into a written contract with the power company to furnish electric energy for its operation from the power company's main feeder lines; the power so contracted to be delivered and metered at the Hatfield substation. Later, and by a verbal arrangement, the power company, under the supervision of Morris, manager of the coal company, constructed a connecting transmission line from its Hatfield substation a distance of approximately two miles to the Borderland operation, and tapped onto its old system of lines which had been reconditioned for the receipt of the new current.

On the morning of December 3, 1928, the plaintiff's decedent, who was the wife of one of the employees of the coal company, and at the time of her death resided in one of said company's houses, while passing through the back yard of her son, Virgil Booton, came in contact with one of the electric wires which had broken and fallen, and was instantly killed. The evidence does not disclose what caused the wire to break and fall, but does fully show that it could not have been down more than thirty minutes before plaintiff's decedent came in contact with it.

The first question goes to the liability of the power company. The declaration charges that both the power company and the coal company were the owners and operators of the power line which caused the damage. As already stated the power company built the line from the substation at Hatfield to the substation near the tipple of the Coal Company, a distance of two miles. The lines of the coal company (which formerly had been installed to carry 110 volts) were reconditioned by the servants of the coal company to carry 2,300 volts before the power company was given direction to turn current into it. The power company measured and sold its current at the Hatfield substation. The line which the power company had constructed before beginning its service is not a part of the line which caused the damage sued for in this case. There is no contention that it was a joint owner of the lines leading out from the coal company's substation to its tenement houses and mines. The following provision in the contract of April 26, 1928, is cited for the purpose of fixing liability: ''The (power) company shall be the sole judge as to the suitability of apparatuses to be connected to its line and also as to whether such apparatuses or appliances will be detrimental to its general service.'' But this provision, when read in its setting with the other provisions, to our mind, does not admit of such an interpretation. It does not relate to the matter of liability of the power company which is covered by another section of the contract. The section of which the quoted provision is a part provides that the tariff to be charged shall be determined by the character of the ultimate use of

the energy; that the meters, transformers and other appliances supplied by the power company have definite capacities, and shall not be overloaded by additional use of energy not contemplated; that the coal company shall install only such motors or other apparatus or appliances "as are suitable for operation with the character of the service supplied by the Power Company, and which shall not be detrimental to the same, and the electric power must not be used in such a manner as to cause unprovided for voltage fluctuations or disturbances in the Power Company's distributing system." It is apparent that the foregoing section (styled "Use of Energy") was intended to protect the company in its effort to furnish the public an even flow of electricity from the installation and use of motors of a type which might cause unprovided for voltage fluctuations or disturbances. It did not attempt in any way to govern the type of lines to be used by the company in distributing the power purchased. But the use of the quoted section, as evidence of liability, while discussed to some extent in the plaintiff's brief, was practically abandoned at the hearing of the case. Aside from any other reason, we must hold that the averments in the declaration that the power company jointly owned and controlled the wire causing the injury, is not sustained in the proof.

In 20 Corpus Juris, p. 364, the doctrine is stated: "The duty and responsibility of a mere generating company is limited to making a proper connection and delivering the electric current to the purchaser's wires and appliances in a manner which so far as such delivery is concerned protects life and property, and there is no duty of inspection to see that the purchaser's wires and appliances are in safe condition and kept so." Again in Ruling Case Law, at page 1204, we find the statement: "It is generally held that where electric wires or other appliances which have caused personal injury are not owned or controlled by the company furnishing the power it is not liable for the damage sustained. * * * In such case since the company is only employed to deliver the current by connection with the wiring already made by the individual who owns the property, its responsibility ends when

the connection is properly made under proper conditions and it delivers the current in such a manner which will protect both life and property." In our state, in *Fickeisen* v. *Wheeling Electrical Co.,* 67 W. Va. 335, 67 S. E. 788, 27 L. R. A. (N. S.) 893, it is held that there is no obligation upon a generating company, that sells and delivers electricity to a distributing company, to see that the lines of the latter company, over which the current is to be carried to the consumer, are in safe condition. The former is not liable for the negligence of the latter. Nor is there anything in the evidence to show that the power company in the instant case had any responsibility of the wires' maintenance or knew of their defectiveness. So we must conclude that under no view of the case is the power company liable. But, can we say that the proof failing as to the power company, it may be dismissed upon appeal to this court? We think so. While this was not permissible at common law, we have adopted the modern rule in ·*Pence* v. *Bryant,* 73 W. Va. 126, 80 S. E. 137, which sanctions such procedure.

Now as to the liability of the coal company. It took the position at the hearing that if there is any liability, it is joint, and therefore that the trial court invaded the province of the jury to its prejudice in invoking the doctrine of res ipsa loquitur. In support of this position it quotes the following from Shearman & Redfield on Negligence (6th Ed.) § 58B, p. 121: "If from the nature of the event causing the injury, an inquiry naturally arises which one of two or more persons acting independently is responsible; or if it appear that the injury was proximately caused by the independent acts of two or more persons, the application of the maxim is excluded by its terms." Our disposition of the question of the power company's liability robs this position of the coal company of any value it might have had, had our decision been otherwise. The question therefore resolves itself into this: Did the court err in directing a verdict against the Coal Company? In 9 R. C. L. 1221, in discussing the rule of res ipsa loquitur as applied to injuries from electricity, it is stated, in effect, that the mere introduction of facts surrounding an injury from

electricity showing that such injury resulted from contact with live wires or other appliances, when out of proper condition, or out of their proper place, may suffice, to raise a prima facie presumption that the electrical company having such appliances in charge has been neglecting the performance of its duty, and to place upon the company the burden of overthrowing such presumption. To like effect: *May* v. *Railroad Co.*, 75 W. Va. 797, 84 S. E. 893; *Bice* v. *Wheeling Electric Co.*, 62 W. Va. 685, 59 S. E. 626; *Snyder* v. *Wheeling Electric Co.*, 43 W. Va. 661, 28 S. E. 733, 39 L. R. A. 499, 64 Am. St. Rep. 922. The doctrine is based in part upon the theory that the defendant in charge of the instrumentality which causes the injury either knows the cause of the accident or has the best opportunity of ascertaining it, and that the plaintiff has no such knowledge, and therefore is compelled to allege negligence in general terms and to rely upon the proof of the happenings of the accident in order to establish negligence.

The sun was shining on the day of the accident. There had been no recent storms. The wire was in place a short time before the decedent came in contact with it. The evidence introduced on behalf of the plaintiff not only showed that the death was due to coming into contact with the fallen wire, which, under the doctrine of res ipsa loquitur, raised a prima facie presumption of negligence, but also that the wire was old and corroded, and had broken numerous times while being reconditioned for the higher voltage. In defense of this the company put on the witness stand a man, formerly in their employ, who had been in charge of the work. He stated that he did all he knew how to do to comply with instructions which had been given to him and to discharge his duties as his experience taught him to do in constructing the line and making it safe. It is not denied that the wire was old, or that it broke during construction. His only comment was that it seemed to be good. While this witness volunteers that the breaking which caused the accident might have been due to an inherent weakness in the wire and not discoverable, no evidence is offered on behalf of the company to show that it made any effort to ascertain from the broken wire itself whether or not

the break was caused from such weakness or from insufficient inspection on the part of the company agents when the same was reconditioned.

There is no question but that the plaintiff made out a prima facie case. The motion of the defendant coal company to find for it was therefore properly refused. Now, was there appreciable evidence on behalf of the defendant company to rebut the prima facie case? The broken wire was in the company's exclusive control. So far as the record goes it was removed shortly after the accident. The plaintiff was not in a position to ascertain whether the line was corroded due to use, or not. We believe under the rule of res ipsa loquitur that the company was required to make a showing as to the condition of the wire at the time it fell in addition to evidence of proper installation, in order to rebut the prima facie case made, since the purpose of the rule was to protect parties from just such situations as this. When the evidence adduced by one of the parties to a civil action at law is sufficient to warrant a finding in his favor, and no evidence appreciably tending to overthrow the case so made has been adduced by the opposite party, it is the duty of the court to direct a verdict in favor of the former, if requested so to do. *Kuykendall* v. *Fisher,* 61 W. Va. 87, 56 S. E. 48, 8 L. R. A. (N. S.) 94, 11 Ann. Cas. 700.

The judgment must therefore be affirmed as to the coal company.

*Reversed and dismissed as to Power Company;*
*affirmed as to Coal Company.*