William G. MEEKS, Administrator of
Estate of William G. Meeks, Jr.,
Deceased, Plaintiff,

v.

APPALACHIAN POWER COMPANY,
a corporation, Defendant.

Civ. A. No. 2292.

United States District Court
S. D. West Virginia.

Jan. 25, 1960.

**470**

J. G. F. Johnson, Point Pleasant, W. Va., and Sidney E. Goad, Charleston, W. Va., for plaintiff.

J. Campbell Palmer, III, Charleston, W. Va., for defendant.

FIELD, Chief Judge.

This is an action for wrongful death instituted by the plaintiff as administrator of his deceased infant son. The complaint is framed with much more particularity than required or ordinarily appropriate under the Federal Rules of Civil Procedure, rule 7 et seq., 28 U.S. C.A., and contains several allegations of negligence as well as financial and pecuniary loss as a result of the death of the plaintiff's decedent. The complaint carries a demand for damages in the amount of $20,000. The case is presently before the Court upon the defendant's motion to dismiss as well as its motion for summary judgment.

## Motion to Dismiss

The motion to dismiss herein challenges the jurisdiction of this Court, the defendant contending that the maximum amount recoverable by plaintiff under the West Virginia statute in this particular case would be $10,000, and, it, therefore, falls short of the requisite jurisdictional amount.

The West Virginia version of Lord Campbell's Act is contained in Sections 5 and 6, Article 7, Chapter 55, West Virginia Code. Section 5, in general, creates a cause of action growing out of the wrongful death of a party and contains other provisions in regard to the survival of the cause of action against the personal representative of the wrongdoer. Section 6 spells out the manner in which such action shall be instituted and provides that the jury may give such damages as they shall deem "fair and just," not exceeding $10,-000. This was the substance of Section 6 and $10,000 was the recoverable amount thereunder until the amendment of this Section in 1955. In that year, the Legislature added a provision which, in effect, states that if the plaintiff shall prove by a preponderance of the evidence financial or pecuniary loss in an amount exceeding $10,000, the jury may give damages for such financial or pecuniary loss, not exceeding $20,000 as the total of all damages recoverable in such action. The defendant's position is that pliantiff's decedent was only twelve years old at the time of his death; that under West Virginia law he could not properly have been employed in a gainful occupation and, therefore, it would be impossible for plaintiff to here recover any more than the initial $10,000 under the statute. If defendant's position is meritorious then, obviously, this Court is without jurisdiction.

This Court, of course, will follow the statutory law of the State of West Virginia if the statute is clear and unambiguous, and if any ambiguity does exist then this Court will look to the interpretation by the Supreme Court of

Appeals of this State. All of this, is well established. Erie Railroad Company v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188. However, this particular question in regard to the statute as amended in 1955 has not been raised in the Supreme Court of Appeals of this State, and, accordingly, it is incumbent that I pass upon it at this time without the benefit of such interpretation. Like so many of our statutes, the pertinent provisions of the wrongful death statute with respect to the recoverable amount were quite similar, if not identical, to the Virginia statute prior to 1955. When the General Assembly of Virginia raised the recoverable amount in such actions to $30,000, it left the phraseology of the statute unchanged. Unfortunately, when the West Virginia Legislature increased the recoverable amount, it saw fit to couch the amendment in the language above referred to which undoubtedly raises some question and furnishes the basis for defendant's contention.

■ After careful consideration, it is my opinion that in spite of the ambiguous language, for Federal jurisdictional purposes an action for wrongful death under the West Virginia statute involves a potential recoverable amount of $20,000. It is true that the first part of Section 6 provides for damages that are "fair and just" not exceeding $10,-000, but it goes forward to provide that in the event financial or pecuniary loss is shown by "a preponderance of the evidence," recovery may be obtained not to exceed $20,000. As I see it, these respective provisions of the Section refer to *evidence* that may or may not be presented upon the trial of the case which would justify a recovery within the maximum limits of the statute. Whether or not plaintiff can show any pecuniary loss resulting from his decedent's death will depend upon evidence adduced at the trial, but I think the statute permits him to allege such loss and offer evidence in an attempt to justify a verdict up to the statutory maximum amount of $20,000.

■ Nor am I persuaded that either the tender years of the decedent or the statutes of West Virginia with respect to the employment of minors is at all controlling on this question. I feel that the opinion of the Court of Appeals of our sister State of Virginia in the case of Gough v. Shaner, 197 Va. 572, 90 S.E. 2d 171, 176, correctly analyzes this phase of damages incident to an action for the wrongful death of an infant, and I am inclined to believe that the basic legal principle as to the potential recovery under these Acts is the same. In the cited case, Judge Miller stated, inter alia:

"Section 8–636 allows the jury to award within the statutory limit such damages 'as to it may seem fair and just'. Under this broad and permissive language, any 'pecuniary loss' suffered by the statutory beneficiaries is clearly a proper element of damage.

" ' * * * this court has given the phrase "fair and just" a broad and liberal construction. * * *' * * *

"In view of the comprehensive language of the statute, the phrase 'pecuniary loss,' when used in an instruction in connection with what damages are recoverable, is to be given liberal interpretation. When so construed, it does not mean merely the loss of immediate monetary benefits, nor is it limited to the loss of pecuniary benefits susceptible of positive proof and exact estimate. In addition to financial loss, it includes present and prospective loss of services, nurture and care, and other advantages and benefits of a pecuniary nature which have been cut off or will probably be lost in the future by reason of the death of the person from whom derived or from whom they might have been expected."

In that case, the defendant's decedent was thirteen years of age, and in spite of the admitted difference in the phraseology of the two statutes, I think the

quoted language is particularly appropriate on the instant question under the West Virginia Act.

For the reasons stated above, it is my opinion that the plaintiff's complaint contains an adequate allegation of the requisite jurisdictional amount in controversy, and, accordingly, defendant's motion to dismiss must be denied.

## Motion for Summary Judgment

In passing on defendant's motion for summary judgment it is necessary to review some of the facts relative to this case as disclosed by the pleadings and the affidavits. Sometime prior to 1949, a group of citizens in Putnam County decided to raise the necessary funds and install a lighting system at the athletic field of the high school at Hurricane, West Virginia. As a result light poles were placed at intervals around the field and inside of an enclosing fence. The poles on which the tiers of lights were placed are described in the complaint as being 125 feet, or more, in height, but the exhibits filed herein indicate the height of these poles to be about 80 feet. However, I do not believe that this variance is material at this time. It seems that the primary wires were placed about halfway up these poles, being some 30 feet above the ground. In order to stabilize these poles, guy wires were attached about 10 feet from the top of the poles and secured in the earth by the use of "dead men," none of the guy wires having any insulators or breakers.

There is an allegation in the complaint which is denied by the defendant that defendant's agents supervised the installation of the lighting system and inspected it prior to its operation. In any event, defendant connected its distribution line to the lighting installation, the use of the power being controlled by a meter on the customer's pole which meter was under the control of the civic group and their successors. It seems to be undisputed that the primary line which was strung about halfway up the lighting poles carried a voltage of approximately 7,200 volts, which, of course, was furnished by the defendant company. There appears to be a question as to whether the insulation on the primary lines as originally installed was sufficient to contain this voltage.

Several years after the installation of the lighting system the civic group turned the entire facility over to the Board of Education of Putnam County and it was controlled by that Board at the time of the death of plaintiff's decedent. Sometime prior to September 19, 1958, the guy wire on one of the light poles was pulled from its ground anchorage and apparently swung at random. Upon observing this condition, someone secured the guy wire to the fence which enclosed the athletic field. On the evening of September 19, following a football game, plaintiff's decedent and some others in some manner loosened the guy wire and were using it as a "swing." While so engaged, the plaintiff's decedent swung on the wire in such a fashion as to bring it into contact with the high voltage primary line and he was immediately electrocuted.

In its motion for summary judgment, defendant contends that it properly and without negligence supplied power to the customer's installation and, that having done so, it was not responsible for any injuries resulting from the condition of the field lighting system irrespective of whether such condition resulted from an improper installation or from any subsequent deterioration or deficiencies.

Before considering defendant's contention on this question, I would like to point out that this entire matter presently must be viewed by me in the light of the principles appropriate upon a motion for summary judgment. An investigation of the cases discloses that the very nature of actions involving an issue of negligence renders it exceedingly difficult to dispose of them on such a motion. Summary judgment procedure cannot be a substitute for the trial of disputed issues of fact for its purpose is to determine whether there are issues properly to be tried. The foreseeability of risk with the resultant duty on a party and the question of whether

the conduct in question has met the standard of the reasonable and prudent person, are, of course, subject to jury determination and cannot be resolved upon summary motion. 3 Barron & Holtzoff § 1232.1 et seq. The party who moves for summary judgment has the burden of showing that there is no genuine issue of fact and any doubts as to the existence of such an issue must be resolved against the party moving for judgment. Abrams v. Baltimore & O. R. Co., D.C., 147 F.Supp. 521. Dulansky v. Iowa-Illinois Gas & Electric Co., 8 Cir., 191 F.2d 881.

■ The sole question then is whether defendant's motion can properly be granted in the light of the above stated principles. Defendant takes the position that the pleadings and affidavits indicate that this is a clear-cut case where the electric generating company should not be charged with liability for an injury resulting from some defective condition in its customer's system. In support of this contention, it has cited the classic case in this State of Fickeisen v. Wheeling Electrical Co., 67 W.Va. 335, 67 S.E. 788, 27 L.R.A.,N.S., 893. In that case the generating company sold and delivered electricity to a company which was in the electric distribution business, and the alleged injury resulted from a condition in the latter company's lines. The Supreme Court of Appeals in that case, quite properly I think, held that the generating company had no duty or liability to the injured party. Defendant also cites the case of Duncan v. New River Pocahontas Consol. Coal Co., 114 W.Va. 388, 174 S.E. 370, 374. That case involved the question of the liability of the coal company which maintained a distribution system serving its coal camp and bought its power from the generating company. I do not believe that case is particularly in point on the instant question and it is interesting to note that in its opinion the court made this observation:

"From the standpoint of safety, the control of electric power is mainly negative. It is the power to prevent it from reaching points where it could do harm. The jury might find from the record in this case that both the Appalachian Electric Power Company and the defendant controlled the current over these lines from that standpoint."

While the above observation was not necessary to the disposition of that case it does illustrate the point that it is difficult to classify these cases in an arbitrary or categorical fashion. The case of Martin v. Appalachian Electric Power Co., 109 W.Va. 129, 153 S.E. 245, 246, cited by defendant, is another case involving the question of liability of a generating company which furnished electric power to a customer's distribution system. In that case the Court stated:

"* * * there is no obligation upon a generating company, that sells and delivers electricity to a distributing company, to see that the lines of the latter company, over which the current is to be carried to the consumer, are in safe condition. The former is not liable for the negligence of the latter. Nor is there anything in the evidence to show that the power company in the instant case had any responsibility for the wires' maintenance or knew of their defectiveness."

■ I think the above cases indicate clearly that in West Virginia a generating company which properly furnishes electric power to a distributing company has no duty or responsibility to inspect the latter's system, nor is it liable for any injuries resulting from any defects or negligent conditions in the customer's system. The factual situation and the proper spheres of responsibility are clearly outlined in such cases. However, it would appear that even in these decisions, the court has recognized the possibility of the existence of additional conditions or circumstances which would disturb the clear-cut confines upon which those decisions were based.

The cases of Peters v. Lynchburg Light & Traction Co., 108 Va. 333, 61

S.E. 745, 22 L.R.A.,N.S., 1188 and Minneapolis General Electric Co. v. Cronon, 8 Cir., 166 F. 651, 20 L.R.A.,N.S., 816, cited by defendant, each involved a situation where the injury resulted from a demonstrated defect in the electrical system of a residence or business establishment. The courts in each case properly held the distributing company was not liable for injuries resulting from such conditions. Here again, these cases like those involving distributing companies must be considered in the light of the clear-cut factual situation therein.

Plaintiff's counsel have cited cases in which the power companies have been held liable and it is interesting to note that in these cases, too, the factual situation or relationship of the parties furnishes a sound basis for the decisions. The case of Morrison v. Appalachian Power Co., 75 W.Va. 608, 84 S.E. 506, involved a situation where it was clearly shown that the power company had the complete ownership and control of the transmission lines which caused the injury. The case of Virginia Electric & Power Co. v. Carolina Peanut Co., 4 Cir., 186 F.2d 816, 32 A.L.R.2d 234, involved a situation where an emergency had arisen and the power company's manager, after being notified of the situation, failed to take the necessary steps which could have prevented the plaintiff's loss. Such cases are at the opposite end of the spectrum from those cited by the defendant and to me are just as well defined in their factual basis for holding the power company liable as are the former for denying liability.

Undoubtedly, the courts have long recognized the lethal qualities of electricity and the high degree of duty and care requisite to its use. As was stated in Morrison v. Appalachian Power Co., supra [75 W.Va. 608, 84 S.E. 508]:

"'Reasonable care' and 'negligence' are relative terms and depend upon the circumstances and exigencies of the particular case. The greater the danger to others from failure to exercise care, the greater is the degree of care required."

Defendant has referred to several rulings of the Honorable Judge Ben Moore to the effect that a power company is not required to insulate wires which are at a minimum level of 15 feet above the ground. This criterion is also set up in the rules and regulations of the West Virginia Public Service Commission. I have no doubt that the rulings of Judge Moore were quite proper in the cases in which he applied this rule and certainly the regulation of the Public Service Commission is probably justified on the grounds of economic necessity. Unfortunately, however, cases such as this cannot be disposed of by the mere application of arbitrary criteria for each case depends upon its own peculiar facts with respect to the possible duty that may rest upon the defendant and the standard of care incumbent upon him commensurate therewith. See McKinney v. Appalachian Electric Power Co., 4 Cir., 261 F.2d 292. A case appropriately illustrative of this point is Appalachian Power Co. v. Mitchell's Adm'x, 145 Va. 409, 134 S.E. 558, 561. That case involved electrocution as the result of contact with a guy wire situate on the property of a customer of the defendant power company. In that case the defendant relied upon the classic cases cited by defendant's counsel here and in support of contentions similar to those in the instant case. In its opinion, the Court said:

"It seems to us, upon the question of the negligence of the company, the actual ownership of the line is a matter of little consequence, under these circumstances, because to transmit such a deadly current of electricity over such carelessly constructed and unprotected wires is primary negligence on the part of the company, and this whether it owned or controlled the wires or not. It may be true that the institute is also chargeable with negligence, but that cannot relieve the company unless it was free from

negligence, because joint tort-feasors are equally liable.

"No one knows the precise time or exactly how the guy wire was brought in contact with the transmission line, but that from the time of its construction there was constant danger of such contact with the lowest transmission wire is perfectly apparent."

In the earlier case of Gallaher v. Waynesboro Mutual Telephone Co., 143 Va. 383, 130 S.E. 232, the Virginia court had approved the principle of law as enunciated in Fickeisen v. Wheeling Electrical Co., supra, and on the petition for rehearing in the Mitchell case counsel for the power company contended that the opinion was in conflict with the law as settled in the Gallaher case. However, the Court answered this by pointing out that the additional factors which were present as indicated in the opinion would differentiate the Mitchell decision from the prior case.

Similarly, the case under consideration involves factors that remove it from the clear and well defined area of the cases cited by counsel for both parties herein. Here the plaintiff has alleged that the defendant negligently supervised the construction of the lighting system at the field; that the lines carrying voltage of 7,200 volts were improperly placed and insufficiently insulated; that the guy wires on the poles were improperly placed in a position of proximity to the high voltage line; and that the defendant transmitted this high voltage into the lighting system when it knew or should have known of the hazardous condition. These allegations are to some degree supported by the affidavits herein. Whether they will be supported by a preponderance of evidence or the case developed in such a manner as to require a jury determination of the facts remains to be seen. In this opinion I am not prejudging the questions of law with respect to the allegations of negligence which may develop in the trial of this case, but I do feel that it is quite evident that there are genuine issues with respect to material facts as shown by the pleadings and affidavits in this case that make it necessary for me to deny defendant's motion for summary judgment under the established principles applicable to such motions.