# Richmond

## VIRGINIA ELECTRIC AND POWER COMPANY v. LONEY L. DANIEL.

April 24, 1961.

Record No. 5209.

Present, All the Justices.

The opinion states the case.

*Ralph H. Ferrell, Jr.* and *E. Milton Farley, III* (*George D. Gibson; Hunton, Williams, Gay, Powell and Gibson,* on brief), for the plaintiff in error.

*G. Kenneth Miller* and *Nicholas A. Spinella* (*May, Garrett, Miller and Newman; Spinella and Spinella,* on brief), for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

Loney L. Daniel, the appellee (plaintiff), brought this action against Virginia Electric and Power Company, appellant, and the City of Richmond, to recover damages for injuries suffered by him when his hand came in contact with an electric wire. The city was dismissed as a defendant because the plaintiff failed to give it the required statutory notice of his claim. *Daniel* v. *City of Richmond,* 199 Va. 490, 100 S. E. 2d 763. The plaintiff afterwards prosecuted the action against the Power Company and obtained a verdict against it for $37,500, on which the court entered the judgment from which this appeal was allowed.

Under its assignments of error the Power Company contends that the evidence failed to show that it was guilty of negligence; that as a matter of law the plaintiff was guilty of contributory negligence; that the jury was improperly instructed, and that the verdict was excessive.

There is no material conflict in the evidence as to the essential facts. Daniel, the plaintiff, who was twenty-four years old, was employed by Fibre Board Container Corporation and worked in its building on the north side of Williamsburg avenue in the 3200 block in the city of Richmond. He had been employed there since January 7, 1954. On May 17, 1954, the date of the accident, he was working on the 3:30 p.m. shift, his job being to operate a hand truck and bring material to and remove finished stock from a press located on the second floor of the building. Around 10:30 p.m. the press broke down and Daniel, with two fellow workers, stepped out of a door onto the second floor landing of a metal fire escape attached to the south side of the building above the sidewalk on the north side of the avenue. Their purpose was to take a smoke. It was drizzling

rain and the night was dark. Daniel was standing with his back to the outside rail of the fire escape landing. He finished his cigarette, then turned and flipped it into the street. In doing so his hand struck the electric wire and was badly burned, resulting in painful and permanent injury.

The wire with which his hand came in contact was owned and operated by the City of Richmond and carried 30 amperes during nighttime operation and from 2,000 to 5,000 volts of electricity, which was used by the city to serve its street lighting system. The wire was not insulated but had only a weatherproof covering. It ran parallel to the side of the building, was 22 inches from the fire escape, measured horizontally, and five feet above the extended level of the floor of the fire escape landing. The minimum for these distances was three feet and eight feet respectively, according to the National Electrical Safety Code.

This wire, along with two other street lighting wires of the city spaced farther away from the fire escape, stretched from a pole owned by the city standing some distance east of the fire escape to a crossarm on two poles owned by the Power Company, which stood west of the fire escape, and about nine feet apart with a connection between them forming an H-frame and supporting three transformers. Electric lines of the Power Company coming from the west led into these transformers, from which electric current was carried into the building to serve the Fibre Board plant. The nearest of these two poles was 30 feet to the west of the fire escape, and the Power Company's lines ended at that point. The city wires, including the one which the plaintiff touched, were not connected or associated in any way with these Power Company wires and transformers, but proceeded on west past the Fibre Board building.

The crossarm on the Power Company pole, which carried the city wires past the Fibre Board building, was placed there by the city pursuant to a joint use agreement between it and the Power Company, as referred to below.

The electric current carried over the city wire, which the plaintiff touched, was generated by the Power Company and by it sold and delivered to the city at 13,200 volts at the city's Fulton Gas Works Substation east of the Fibre Board building, pursuant to an interchange agreement between the city and the Power Company made in 1941. There the city, through transformers owned, operated and controlled by it, reduces the voltage down to the different voltages

required for the city's uses, one of which is to operate a street light substation which operates the lights on the city streets. Practically all of the street lighting system in the city is constructed, operated and maintained by the city.

The joint use agreement between the city and the Power Company, referred to above, was made November 19, 1913, and provided for the use by the one of the poles of the other to the extent and on the terms stated in the agreement, which included the provision that upon receipt of a written application the owner would grant to the applicant permission to occupy a portion of the owner's pole, stating how much, for the attachment of crossarms and fixtures to support wires, etc., in consideration of a stated rental. Upon the granting of permission the applicant would have the right to use such portion of the pole for any number of fixtures, attachments and devices, to be arranged in a manner satisfactory to the owner, the arrangement to be outlined in the application and approved in the permit. If the owner objected to the proposed attachments, then the applicant could apply to the city engineer to grant the desired right and he would determine the question.

The plaintiff argues that by the force of this agreement the Power Company must be taken to have approved the location of the wire with which the plaintiff's hand came in contact. The evidence does not support that contention. To the contrary, the chief electrical engineer of the city, a witness for the Power Company, testified that in operating under the agreement the city sends a written application to the Power Company requesting certain space on the latter's pole, and if it is the customary space normally used the Power Company signs the permit and returns it "and that was usually the end of it"; that it was usually a matter of routine to use one another's poles; that details of construction other than the assignment of space on the pole was usually not involved; that the city would merely ask for space on the pole, the first, second or third gain (ordinarily a space of 24 inches) and that was all. He testified that after the city got the use of the space the city decided where to put the wire. As noted, the agreement itself provides that if there is any objection to the proposed attachment the city engineer decides the question. This witness was asked on cross-examination if a form was used to inform the Power Company of changes desired to be made on the pole so as to secure its approval, and he replied that such was done only when less space or additional space was being requested; that otherwise the Power Company was not notified. "We have rented our

space and we can do what we want to with it," he said. There was no contradiction of this testimony.

Plaintiff further contends that the status of the Power Company at the scene of the accident was more than a mere generating company and included that of a distributing company, charged with exercising a high degree of care with respect to the use of its poles by the city. That contention was rejected by the trial court which gave to the jury an instruction telling the jury that the electric line in front of the fire escape where the plaintiff was injured was not the property of the Power Company; that the Power Company did not transmit electric current over said line, and that the Power Company "was under no duty to inspect, maintain or repair the line." No cross-error was assigned to the giving of that instruction and it is therefore the law of the case, as it is generally the law of the land.

"* * When a transmission line is neither built, owned, nor controlled by a utility sought to be charged with damages arising out of its condition, such utility is neither bound to inspect the line nor obligated to respond in damages for injuries sustained by its defective construction or condition unless it supplies current actually knowing of these conditions and the current is the cause of the injury sued for, in which case it is the energizing of the line with knowledge of the conditions and not the conditions themselves which forms the basis of liability." *Oesterreich* v. *Claas*, 237 Wis. 343, 349, 295 N. W. 766, 768, 134 A.L.R. 499, 502; Anno., 134 A.L.R. 508, 511; *Martin* v. *Appalachian Electric Power Co.*, 109 W. Va. 129, 153 S. E. 245; 29 C.J.S., Electricity, § 57 a., p. 611; 18 Am. Jur., Electricity, § 102, p. 498.

Such is the established rule in this jurisdiction: *Haywood* v. *South Hill Co.*, 142 Va. 761, 128 S. E. 362; *Barnett* v. *Virginia Public Service Co.*, 169 Va. 329, 193 S. E. 538, and other Virginia cases therein cited.

*Andrews* v. *Appalachian Electric Power Co.*, 192 Va. 150, 63 S. E. 2d 750, relied on by plaintiff, did not change or modify this rule. It dealt with the Power Company's duty of inspection and of ascertaining thereby dangers threatened to its own line even though not caused by it.

The court further instructed the jury, over the objection of the Power Company as well as of the plaintiff, that under the circumstances shown by the evidence the Power Company "owed the duty to any member of the public likely to be affected by the said wire to exercise ordinary care under all the circumstances for

such person's safety"; and that if the city maintained its wire in a negligent manner and the Power Company "knew, or in the exercise of ordinary care with respect to its own facilities should have become aware of any such negligence of the City," yet continued to furnish to the city electric current for ultimate use in said wire, then the Power Company was guilty of negligence. It is to be presumed that this instruction furnished the basis for the verdict.

The instruction aimed at a principle generally recognized and operating as an exception to the general rule respecting generating companies; *i.e.*, that an electrical company is not liable for defects in lines and appliances which it does not own or control and which it has no duty to inspect or maintain; but if it actually knows of a dangerous condition in such a line or appliance, yet continues to supply electric current thereto, it may be responsible for resulting injuries. In such case it is the energizing of the line with knowledge of the condition, and not the condition itself, which furnishes the basis of liability. *Oesterreich* v. *Claas, supra;* 29 C.J.S., Electricity, § 57 at p. 612; 18 Am. Jur., Electricity, § 102 at p. 498; *Boutlier* v. *City of Malden*, 226 Mass. 479, 486-7, 116 N. E. 251, 254.

It is to be noted that the instruction went beyond the requirement of actual knowledge and permitted recovery also if the Power Company should have become aware of negligence on the part of the city. There was no evidence at all to prove actual knowledge; but even on the basis of constructive knowledge the plaintiff's evidence was not sufficient to cast liability on the Power Company.

The only evidence offered by the plaintiff to convict the Power Company of such awareness came from two witnesses. One was a maintenance man employed by Fibre Board. He testified that several years before the accident, he thought it was 1948 or 1949, "something like that," Fibre Board had to have them (Power Company employees) come down there to disconnect the Power Company lines that went into the building from the transformers on the H frame, and they went up on a ladder to disconnect the current coming into the building. He said that if a person was on the pole at the level of the wires coming in from the east [the opposite direction from the Power Company lines], there was nothing to prevent his seeing the fire escape and the wires down the road to the east, but he did not know whether these employees went up on the pole. The only other time he would see the Power Company employees would be when they came in to read the meters.

The other witness was a press operator who had worked for Fibre Board for two years prior to the accident. He testified that on one occasion during that period he saw the Power Company men in the street and on the north side of Williamsburg avenue, but he did not know what they were working on, and he had seen their trucks "on the corner" several times, but couldn't say what they were doing.

It is to be remembered that there was no duty on these employees or their employer to inspect this city wire that did the damage. If they looked at it or saw it at all, which is not shown, it is entirely speculative whether they would have seen that this wire was closer to the fire escape and lower than the minimum standard requirement; or that they would have seen that it was not insulated or known it was carrying voltage that required insulation; or that they would have realized that this wire created a dangerous situation likely to cause injury to a person using the fire escape for its usual purposes. If they did any of these things they did more than the plaintiff and his witnesses. Plaintiff's two fellow workers, with him at the time of the accident, said they had been on the fire escape many times, the plaintiff said he had been there twice before, yet none of the three had ever paid any attention to this wire, nor had any other employee of Fibre Board, so far as the record shows.

In this case no wire or appliance owned or controlled by the Power Company caused or contributed to the plaintiff's injury in any manner. It was caused by a wire which was owned and controlled by the city and which the Power Company had no duty to inspect. In these circumstances there was no liability on the Power Company unless it had knowledge of the negligence of the city in the placing of this city wire. The Power Company cannot be charged with such knowledge on the evidence produced by the plaintiff in this case, which showed only that some employees of the company, of undisclosed position with the company and of unknown qualification, may have seen that this city wire had been so placed by the city as to threaten injury to persons who could reasonably be expected to use the fire escape. Cf. *Fickeisen* v. *Wheeling Electrical Co.*, 67 W. Va. 335, 341-2, 67 S. E. 788, 791. The evidence was not sufficient to support the verdict.

In this view we do not reach, and it is unnecessary to discuss, the appellant's other assignments of error.

The judgment appealed from is reversed and final judgment for the appellant will be entered here.

*Reversed and final judgment.*