OESTERREICH, Administratrix, Appellant, vs. CLAAS and another, Respondents.

*November 6, 1940—April 15, 1941.*

344

*Max Raskin,* attorney, and *Wm. F. Quick* of counsel, both of Milwaukee, for the appellant.

For the respondent Henry Claas there were briefs by *Lowry & Williams* of Waukesha, and oral argument by *Homer J. Williams.*

For the respondent Wisconsin Gas & Electric Company there were briefs by *Shaw, Muskat & Paulsen,* attorneys, and *Seth W. Pollard* of counsel, all of Milwaukee, and oral argument by *Mr. Martin R. Paulsen* and *Mr. Pollard.*

The following opinion was filed January 7, 1941:

WICKHEM, J.    Plaintiff's intestate was instantly killed by electrocution while picking apples in an orchard on the farm of Amanda Raasch in Waukesha county. It is undisputed that he came into contact with a wire carrying 4,800 volts of electricity which ran somewhere in the vicinity of the apple tree. Its precise location is one of the matters contested upon this appeal. The wire was part of a line about one hundred eight rods long running in a southerly direction from a public highway to a transformer on the farm of defendant Claas. The line consisted of twenty-three poles and two wires and was built to furnish electricity to Claas. It was built and paid for by Claas. Claas' farm is located about one-half mile south of the highway from which the line is taken. Between the Claas farm and the highway are the farms of Amanda Raasch and John Wick. These two farms abut on the highway and between them is a private road or lane about one rod wide going from the highway to the Claas farm and used for ingress and egress by the occupants of all three farms. This road runs south for some fourteen hundred feet, turns southeast for about eighty feet, and then runs south to the Claas farm. The line runs south from the highway along

the east side of this road, which is the side adjoining the Wick farm. At the point where the road turns easterly, the electric line crosses the road or lane, and at the point of the accident was on the Raasch property. On this part of the farm an orchard is located. The line was built in 1927, inspected by the electric company before the current was turned on, and a transformer, which is the property of the company, installed upon some portion of the line near the Claas farmhouse. The purpose of the transformer was to step down the current from 4,800 volts to that appropriate for use in connection with the Claas farm. The pole nearest the tree in which Oesterreich met his death leans toward the tree and is braced by a wooden brace anchored on the Raasch farm. At the time the line was built the tree was trimmed. On the afternoon of the accident Oesterreich, his wife, and two boys, together with Ernest Luedtke, his wife and children, drove from Milwaukee to the Raasch farm to pick apples. This was on the invitation of Amanda Raasch, who was Mr. Luedtke's aunt. They drove an automobile with a trailer attached, arrived at the Raasch farm about 3 o'clock in the afternoon, and the women stayed at the house while Oesterreich, Luedtke, and the two Oesterreich boys drove down to the orchard. For some time they stood on the trailer and picked apples. Thereafter, Oesterreich, Luedtke, and one of the boys climbed the tree, the former taking with him a rope and basket. After some time Oesterreich asked Luedtke to get a hacksaw blade from the car so that he could saw a limb. After handing up the hacksaw, Luedtke stayed on the ground and picked up apples that had dropped. Getting no replies to some remarks directed to Oesterreich, he looked up in the tree and saw him sitting on a limb with his left hand, elbow, and cheek resting on a wire. He called the boys and ran to the farmhouse for help, and by that time there was smoke and flame in the vicinity of Oesterreich. The power line was eventually cut and Oesterreich removed from the tree. He had been in-

stantly killed by the passage of electric current through his body.

The nonsuit was granted in this case because of the conclusion of the trial court that neither defendant was guilty of negligence, and that, if they were, Oesterreich was guilty of negligence which exceeded fifty per cent of any total negligence involved. It is the contention of plaintiff that the jury was entitled to conclude from the evidence that there was negligence either in permitting the pole and the wires to sag in the direction of the trees, or in failing to keep the tree trimmed so that it would not be dangerous to anyone who sought to harvest apples by climbing the tree. Reliance is had upon *Wilbert v. Sheboygan L., P. & R. Co.* 129 Wis. 1, 106 N. W. 1058, where this court stated that the hidden and concealed but very high danger involved in the use of electricity requires a higher degree of caution and diligence than ordinary care. To the same effect see also *Nagle v. Hake,* 123 Wis. 256, 101 N. W. 409, and *Hayden v. Carey,* 182 Wis. 530, 196 N. W. 218. See also *Erikson v. Wisconsin Hydro-Electric Co.* 214 Wis. 614, 616, 254 N. W. 106, where this court said:

"Ordinarily the extent to which wires conveying deadly electric currents should be insulated or otherwise guarded is a jury question."

In the *Erikson Case* it was held to be a jury question whether it should have been foreseen that a tree with many branches readily climbed by youngsters would attract a child to climb into a position of peril.

In dealing with this question, it is necessary to give separate consideration to the situation of the two defendants. The contention of the defendant Wisconsin Gas & Electric Company is that the power line was not built, owned, or possessed by it; that it had no legal right to touch or meddle with the poles or wires, and hence no duty to repair or inspect the condition of the line; that under sec. 180.17 (6), Stats., it would

be liable for treble damages to Mrs. Raasch if it had cut or trimmed the tree. It is asserted that there is nothing in the case to show that the company had any knowledge or means of knowledge that there was any dangerous condition along this power line. It is conceded by defendant company that if it had had notice of such a condition, it would have been its duty to cease energizing the line until the owner took the necessary steps to make it safe.

With respect to the liability of the defendant utility, certain rules are established by the nearly unanimous weight of authority. When a transmission line is neither built, owned, nor controlled by a utility sought to be charged with damages arising out of its condition, such utility is neither bound to inspect the line nor obligated to respond in damages for injuries sustained by its defective construction or condition unless it supplies current actually knowing of these conditions and the current is the cause of the injury sued for, in which case it is the energizing of the line with knowledge of the conditions and not the conditions themselves which forms the basis of liability. *Hoffman v. Leavenworth Light, Heat & Power Co.* 91 Kan. 450, 138 Pac. 632, 50 L. R. A. (N. S.) 574; *Barnett v. Virginia Public Service Co.* 169 Va. 329, 193 S. E. 538; *Fickeisen v. Wheeling Electric Co.* 67 W. Va. 335, 67 S. E. 788, 27 L. R. A. (N. S.) 893; *Minneapolis General Electric Co. v. Cronon* (8th Cir.), 166 Fed. 651, 20 L. R. A. (N. S.) 816; *Peters v. Lynchburg Light & Traction Co.* 108 Va. 333, 61 S .E. 745, 22 L. R. A. (N. S.) 1188; *Kelly v. Duke Power Co.* (4th Cir.) 97 Fed. (2d) 529; *Brunelle v. Lowell Electric Co.* 188 Mass. 493, 74 N. E. 676; *Pressley v. Bloomington & Normal Ry. & Light Co.* 271 Ill. 622, 111 N. E. 511; *Princeton Light & Power Co. v. Ballard,* 59 Ind. App. 345, 109 N. E. 405; *Scott v. Rome Ry. & Light Co.* 22 Ga. App. 474, 96 S. E. 569.

The reason for this rule is obvious. While a high degree of care is required of those who undertake to generate and transmit electricity, the liability is nevertheless grounded upon

negligence and is not the liability of an insurer. Therefore, a furnisher of current who may not without trespass have access to equipment to ascertain its condition cannot fairly be charged with negligence in furnishing electricity to the line unless it has actual knowledge of a dangerous condition. It is, of course, obvious that such a person is not in a position to make changes in a system over which he has no control. The furthest the law can reasonably go is to establish a duty on his part not to energize a private line which he knows to be so defective in construction or condition or so dangerously located as to create unreasonable hazards if energized. The statutes of this state fortify this conclusion and point to its reasonableness.

Sec. 196.74, Stats., provides as follows:

"Every public utility and every railroad *which owns, operates, manages or controls along or across any public or private way* any wires over which electricity or messages are transmitted shall construct, operate and maintain such wires and the equipment used in connection therewith in a reasonably adequate and safe manner and so as not to unreasonably interfere with the service furnished by other public utilities or railroads. The public service commission is authorized to issue orders or rules, after hearing, requiring electric construction and operating of such wires and equipment to be safe and may revise these orders or rules from time to time as may be required to promote public safety."

It will be noticed that the statute casts the obligation to construct and maintain wires in safe condition only upon utilities and railroads which own, operate, manage, or control the same.

Sec. 180.17 (6), Stats., provides:

"Any such corporation which shall in any manner destroy, trim or injure any shade or ornamental trees along any such lines or systems, or cause any damage to buildings, fences, crops, livestock or other property, except by the consent of the owner, or after the right so to do has been acquired, shall

be liable to the person aggrieved in three times the actual damage sustained, besides costs."

It is evident that the defendant company could not have exercised any supervisory control over the line or the tree.

Some point is made of the fact that a transformer was installed on the Claas premises by defendant utility and that it was owned by the company. There is nothing defective about this transformer, however, and its ownership and location did not vest defendant company with any control of the power line between the transformer and the highway. The transformer was placed on the Claas premises to step down the voltage to an amount usable by Claas and was for his benefit.

Two Kentucky cases appear to support plaintiff's position. The first is *Thomas's Administrator v. Maysville Gas Co.* 108 Ky. 224, 56 S. W. 153, 53 L. R. A. 147. In that case the defendant utility sold current to a streetcar company which owned its own lines and poles. A defective guy wire became charged with electricity and plaintiff's intestate was killed. It was held upon appeal that the utility was liable. This case was followed in *Lewis v. Bowling Green Gaslight Co.* 135 Ky. 611, 117 S. W. 278, 22 L. R. A. (N. S.) 1169. If, as the language of the opinions seems to indicate, these cases support plaintiff's position, they are opposed to virtually all other cases on the subject and to what appears to us to be the sounder reasoning. They are, however, distinguishable upon their facts, and it may be that the doctrine as stated should be limited to the facts involved. In each of these cases the poles and wires generated but not owned by defendant were upon a public highway, were easily accessible, and could be inspected without trespass. If this distinction is valid the cases would have no bearing in the present case where the privately constructed line was on private premises and not open to entry and inspection by defendant. Several other cases relied on by plaintiff involved injuries by current carried through wires not owned by the defendant but which through sagging, falling, or other mischance had come into

contact with those owned and operated by defendant. These cases turn upon the duty of the utility to inspect and maintain its own wires and have nothing to do with the question involved in this case. *Dansbery v. Northern States Power Co.* 188 Wis. 586, 206 N. W. 882; *Lomoe v. Superior W., L. & P. Co.* 147 Wis. 5, 132 N. W. 623; *Wilbert v. Sheboygan L., P. & R. Co.* 129 Wis. 1, 106 N. W. 1058; *Ryan v. Oshkosh G. L. Co.* 138 Wis. 466, 120 N. W. 264; *Nagle v. Hake, supra,* are all cases falling into this class. It is our conclusion that the trial court properly granted the nonsuit in so far as the utility was concerned.

We now consider the liability of Claas. Since the latter built, owned, and controlled the line, he is obviously under a duty in the premises, and there can be no dispute as to the high character of this duty. *Wilbert v. Sheboygan L., P. & R. Co., supra; Hayden v. Carey, supra; Erikson v. Wisconsin Hydro-Electric Co., supra.* The question with respect to Claas, therefore, in contradistinction with that with respect to defendant utility, requires an analysis of the facts to ascertain whether, viewed in a light most favorable to plaintiff, enough was shown to make a *prima facie* case and to get plaintiff successfully past a motion for nonsuit. In *Thoe v. Chicago, M. & St. P. R. Co.* 181 Wis. 456, 460, 195 N. W. 407, it is said:

"It is the duty of the court to deny the motion if there is any credible evidence which most favorably considered and with the aid of all inferences which might reasonably be drawn therefrom tends to establish the liability of the party making the motion. *Kaley v. Van Ostrand,* 134 Wis. 443, 114 N. W. 817; *Gessner v. Roeming,* 135 Wis. 535, 116 N. W. 171."

It is first contended by Claas that the electrical code is not applicable to him because it applies in terms to utilities and is in response to sec. 196.74, Stats., which authorizes the making of safety rules to implement a requirement that utilities and railroads shall build and maintain their lines in a safe

manner. We do not deem this matter of great importance because the applicable orders which Claas is claimed to have violated are of such a general character as not to increase or change his common-law duty to exercise a high degree of care. As examples of this, order No. 1010 merely requires that all lines shall be built, operated, and maintained so as to minimize the life and fire hazard. Order No. 1213 requires systematic inspection from time to time. Order No. 1214 requires that current carrying parts of equipment be arranged so as to provide "adequate clearance from the ground or other space generally accessible." Order No. 1281 requires that where trees are in the vicinity of supply-line conductors they shall be trimmed, if practicable, so that neither the movement of the trees nor the swinging nor increased sagging of conductors in wind or ice storms or at high temperatures will bring about contact between the conductors and the trees. We see nothing in any of these orders that increases or changes Claas' common-law duties or even makes them more specific, assuming that the orders apply to him. It would be quite different if the order required that current-carrying wires be six feet from the nearest branch of a tree, or prescribed some equally specific standard of construction or maintenance. In the light of this, we proceed to consider the facts as to the discharge of his duty by Claas.

The line was constructed in 1927 and at that time the tree in question was trimmed. It was not trimmed again for eleven years, and this operation was after occurrence of this accident. There was no inspection of the line during that period unless Claas' testimony that he observed the tree some three months before the accident be deemed an inspection, and we think a jury might reasonably question this. At the time of this observation the pole, which had theretofore been braced in evident anticipation that the change of direction would pull it out of line, was leaning about a foot toward the tree and one of the wires was about the same distance from

the closest twig. From this evidence, in view of the high character of Claas' duty, a jury might reasonably conclude that he had breached it by failing to make proper inspection and to anticipate further growth of the tree and further sagging of the pole and wire. To the knowledge of Claas, the tree bore fruit, and persons were likely to gather this fruit by climbing the tree, putting weight upon its branches that would bring them closer to the wire. That the wire had further sagged and that the branches had so grown as to be close to the wire and productive of a dangerous condition is also a permissible conclusion. At the time of his death deceased was seated in the crotch of the branch, and so seated his face, arm, and hand were actually on the wire, and there is testimony that there were branches above and around him. That this condition might have been produced by the sagging of a limb under his weight is arguable, but this does not take the case from the jury, (1) because the foregoing facts are open to the inference that the wire must have been too close to the tree if deceased actually came in contact with it, and (2) because the jury could reasonably infer that the sagging of the limbs by the operation of harvesting apples should, in the exercise of a high degree of care, have been anticipated by defendant Claas. None of these inferences are conclusive, and their force may be impaired by evidence introduced by defendant Claas as a part of his case, but they are sufficient to require denial of a nonsuit.

The trial court also appears to have considered that deceased was not only contributorily negligent but that his negligence was greater than that of Claas, if there is any negligence on the latter's part. We consider this to have been an erroneous conclusion. That deceased climbed the tree without noticing the wire cannot, in view of the state of the foliage, be deemed conclusive of his negligence. That he inconsiderately proceeded to saw off a limb to facilitate the

process of apple picking might be considered by a jury to have had no foreseeable relation to this particular accident.

It might have been otherwise had the operation caused the limb to break and throw decedent to the ground. Further than this, the respective duties of Claas and decedent are measured upon such different standards that comparison at the nonsuit stage is nearly impossible.

For the foregoing reasons we are of the view that the trial court was in error in granting a nonsuit as to defendant Claas.

*By the Court.*—Judgment affirmed as to defendant the Wisconsin Gas & Electric Company. Judgment reversed as to defendant Claas, and cause remanded with directions to grant plaintiff a new trial.

FOWLER, J. (*dissenting*). I agree with the court that the judgment of the circuit court dismissing the case as to the defendant Claas should be reversed, but am of opinion that the judgment should also be reversed as to the defendant the Wisconsin Gas & Electric Company.

The defendant Claas built a line from the general transmission line of the Electric Company to his own premises, a distance of over half a mile. This line went for the most part along a lane leading to the premises of Claas, but passed for a short distance through an orchard of a neighbor of Claas, from whom Claas had permission to locate the line on her premises. On the last pole at the end of this service line the defendant Electric Company placed a transformer by which the Electric Company reduced the voltage of the current carried from its main line to this point from 4,800 to 220 volts. The latter was the voltage which the Electric Company contracted to deliver to Claas for lighting his farm buildings.

The Electric Company used the Claas line to transmit its high-voltage current from its high line to Claas' premises, and there by its own transformer reduced the voltage to the

220 volts it contracted to deliver to Claas, the ultimate and its individual customer. The Claas line was thus made, in effect, a part of the Electric Company's high line. It is the use, not the ownership of the high line the Electric Company operated, that renders it responsible for the proper maintenance of that line. The Electric Company was under the same obligation to maintain the Claas part of its high line in a condition reasonably safe for the public that it was to maintain any other part of its high line in such condition. The Electric Company could not avoid this obligation by shifting it to Claas. Claas, it is true, was obliged by his contract with the Electric Company to maintain this part of the line, but this did not affect the Electric Company's responsibility to the public. If the company wanted to make Claas its agent for the purpose of maintenance and for the inspection necessary therefor, it could, of course, do so, but it could not thereby escape its own responsibility. Claas' negligence, if he was negligent under the circumstances, was the Electric Company's negligence and the company, as well as Claas, is liable for an injury that resulted from that negligence. If this is not yet the rule in this state it should be made so, regardless of decisions from other jurisdictions to the contrary, if any such there be.

In none of the cases cited in the opinion of the court did a factual situation exist such as is above indicated. To my mind the difference between the factual situation here involved and the factual situations involved in those cases renders the rule of those cases inapplicable here. But if the situations are similar enough to make the rulings there made seemingly material as common-law rules they are still of no force here. While the state constitution makes a rule of the common law the law of this state until it is changed by statute, the provision applies only to common-law rules in existence at the time of the adoption of the constitution. Manifestly, at that time, there was no common-law rule as to the liability of companies generating and transmitting current for electric

lighting, as electric current was not then generated and transmitted for such purpose. Court-made law of other states respecting responsibility for such transmission laid down since that time has no force as law here. So far as such law of other states appeals to reason and announces sound public policy, it should be followed by this court; but if it be unreasonable or unsound it should not be followed. To my mind the rulings of the cases cited in the opinion seem unreasonable and unsound as applied to the facts of this case.

The opinion states that before a generating company turns its current on a line not owned by itself, it is under duty to the public to use due care to inspect it to see that it is in proper condition for carrying the current with reasonable safety. I am unable to see why in reason it is not under a like duty in respect to a line it continues to use. If it should not use a line in the first instance unless it takes due care to ascertain that it is in proper condition, by the same token it should not continue to use it without taking due care to ascertain that it is maintained in proper condition.

It is contended that the Electric Company had no right to enter on the premises of the owner of the orchard to trim the tree or do other work of maintenance. If so, it should have acquired that right, or should cease to deliver its current when from improper maintenance use of the line becomes not reasonably safe to the public. If the public service commission orders service over a privately owned line the generating company can, if necessary, acquire the right to go on the premises over which it passes to make necessary repairs by condemnation proceedings. It would be, to my mind, a monstrous doctrine to relieve a transmitting company from making necessary repairs merely because it could not do so without trespassing on private property.

For the reasons stated, I think a new trial should be ordered as to the Electric Company as well as the defendant Claas.

A motion for a rehearing was denied, with $25 costs, on April 15, 1941.