Elaine A. IANIRE, widow of Ronald Ianire, by her next friend, Glenn F. Owens, and Herman A. Ianire, Administrator of the Estate of Ronald Ianire, Plaintiffs,

v.

UNIVERSITY OF DELAWARE, Defendant and Third-Party Plaintiff,

v.

CITY OF NEWARK, a municipal corporation of the State of Delaware, and George & Lynch, Inc., a Delaware corporation, Third-Party Defendants.

Superior Court of Delaware.

New Castle.

June 26, 1968.

James P. D'Angelo and John E. Babiarz, Jr., Wilmington, for plaintiffs.

Clement C. Wood of Allmond & Wood, Wilmington, for defendant and third-party plaintiff.

Thomas G. Hughes of O'Donnell, Hughes & Lowicki, Wilmington, for third-party defendant, City of Newark.

Roger P. Sanders of Prickett, Ward, Burt & Sanders, Wilmington, for George & Lynch, Inc.

STIFTEL, President Judge.

This is a negligence action brought by the widow of Ronald Ianire and by the Administrator of Ianire's estate (hereinafter referred to as plaintiffs) against the University of Delaware (the University). The University filed a third-party complaint against the City of Newark (the City) and George & Lynch, Inc., general contractors. The complaint and the third-party complaint against the City have been answered. The City has moved for summary judgment in its favor. This is the decision on that motion.

For purposes of the summary judgment, the undisputed facts are as follows: Ronald Ianire was employed by Diamond State Telephone Company and was assigned to the Diamond State work crew which was to install a television co-axial cable on the property of the University of Delaware.

The cable was to be installed, in part, underground. The installation process involved installation of a "fish" or "pulling in" wire in the underground conduits.

This wire was, in turn, to be connected to a heavier wire, and the heavier wire would be used to pull the co-axial cable through the conduit.

On August 10, 1966, a crew consisting of five men, including Ianire, were working in the manholes on the premises of the University to complete the "pulling in" operation. The manholes were located near the intersection of Delaware Avenue and Academy Street in Newark. Ianire climbed into one of the manholes, apparently to retrieve a pair of pliers. While so doing, Ianire was electrocuted as the result of a break in the insulation of a cable located in the manhole and carrying 2400 volts.

The power involved in Ianire's death originated from Delmarva Power and Light Company, which sells electricity to the City of Newark. The City, in turn, sells electricity to customers within its confines, and has done so for many years. Although the record contains no evidence of a written contract, one of these customers is the University of Delaware. Most, if not all, of the main campus is served by the City's 4 kv loop, which consists of wires and poles capable of transmitting 4 kv power, and which run along the City's right of way around the University's main campus. The power involved in Ianire's death was fed into the University lines at a "fuse disconnect" located near the southeast corner of South College and Delaware Avenues, Newark.

The electrical distribution system on the University main campus was not built by the City, but rather was built over 17 years before the accident, and modified over the years, under contracts with private electrical contractors. The University owns, operates and maintains the electrical distribution system on its campus. The City neither installs, operates, nor maintains any of the power lines of the University on the University's property.

The City, as supplier of the current purchased by the University, can start and stop the current flowing into the University's wires. To stop the flow of current or to disconnect one of its lines, the University would normally make a request to the City. Before Ianire's death, no-one on behalf of the University had asked the City to disconnect the line that fed power to the line which killed Ianire. Nor did the Diamond State crew ask the City to cut off power at the manholes. The line was disconnected after the accident at the University's request.

■ Under these circumstances, most jurisdictions would not impose liability upon the City because, under the majority rule, a supplier of electricity is not liable for injury or death resulting from defective wiring owned and controlled by the customer, unless the supplier energizes the wires with actual knowledge of such defect. 134 A.L.R. 507; 26 Am.Jur. 20, "Electricity", §§ 105, 106; City of Decatur v. Parham, 268 Ala. 585, 109 So.2d 692 (1959); Memphis Consolidated Gas & Elec. Co. v. Speers, 113 Tenn. 83, 81 S.W. 595 (1904); Fowler v. Tennessee Valley Authority, 321 F.2d 566 (C.A.6th, 1963) (applying Tennessee law); Virginia Electric and Power Co. v. Daniel, 202 Va. 731, 119 S.E.2d 246 (1961); Oesterreich v. Claas, 237 Wis. 343, 295 N.W. 766 (1941). The record contains no evidence that the City had actual knowledge of the wiring defect in the University's manhole.

However, some jurisdictions follow different rules. In at least one jurisdiction, a supplier of electricity must make an initial inspection of the customer's electrical system after the system is installed, but before the supplier energizes the customer's wires, even if the electrical system is solely owned and controlled by the customer. Hoboken Land and Improvement Co. v. United Electric Co. of New Jersey, 71 N.J. L. 430, 58 A. 1082 (1904); Osar v. Public Service Electric and Gas Co., 8 N.J.Misc. 260, 149 A. 767 (1930). Other jurisdictions go further and require the supplier to make periodic reasonable inspections of the customer's electrical system during the time that the supplier furnishes electricity to the customer. Thomas' Adm'r v. Maysville

Gas Co., 108 Ky. 224, 56 S.W. 153 (1900); Daltry v. Media Electric Light, Heat & Power Co., 208 Pa. 403, 57 A. 833 (1904); Fedorawicz v. Citizens' Electric Illuminating Co., 246 Pa. 141, 92 A. 124 (1914); Zinkiewicz v. Citizens' Electric and Illuminating Co., 53 Pa.Super. 572 (1913).[1] The University urges the Court not to follow the majority rule, but rather to adopt the rule under which an inspection, either before the wires are energized, or periodically, is required.

The record indicates that the University's wiring system was installed over seventeen years before the accident. There is no evidence that the defect in the wire involved in the accident existed at that time, nor any evidence tending to show that an inspection made seventeen years before would have revealed the defect in the wire. For this reason, the University's claim based upon the existence of the City's alleged duty to inspect its wiring system before the City energized the wires cannot be considered. Even if an initial inspection was required, the record does not show that the City, by breaching that duty, became liable.

The important issue is whether the City was obligated to make reasonable periodic inspections of the University's electrical system. Since no Delaware cases on this point have been cited to the Court, the question is whether Delaware should adopt the majority or minority rule.

The Court thinks the majority rule is the better rule. As the Wisconsin Supreme Court stated in Osterreich v. Claas, 237 Wisc. 343, 295 N.W. 766, 769 (1941):

"The reason for this rule is obvious. While a high degree of care is required of those who undertake to generate and transmit electricity, the liability is nonetheless grounded upon negligence and is not the liability of an insurer. Therefore, a furnisher of current who may not

without trespass have access to equipment to ascertain its condition cannot fairly be charged with negligence in furnishing electricity to the line unless it has actual knowledge of a dangerous condition. It is, of course, obvious that such person is not in a position to make changes in a system over which he has no control. The furthest the law can reasonably go is to establish a duty on his part not to energize a private line which he knows to be defective in construction or condition or so dangerously located as to create unreasonable hazards if energized."

Any rule requiring periodic inspection by a supplier of electricity would make the supplier responsible

"for defects in the wiring system of churches, theatres, foyers of office buildings, hotels, railroad stations, bus stations, clubs, lodge halls, and a host of other places where the public congregates, despite the fact that the power company, without the permission of the owners of these places, would have no right of access for the purpose of inspection. Such a rule would put such a burden upon the power companies as would tend to put them out of business or to impose upon the consumers of their power greatly increased rates."

Kentucky Utilities Co. v. Sutton's Adm'r, 237 Ky. 772, 36 S.W.2d 380, 384 (1931).

Consequently, it is preferable that where a supplier of electricity neither owns nor controls a customer's electrical system, it should not be required periodically to inspect that electrical system. Thus, since the City had no duty to make periodic inspections, it is not chargeable with knowledge of what such an inspection would have revealed. This being the case, the City's motion for summary judgment is granted.

It is so ordered.

---

1. These cases have been distinguished in Kentucky and Pennsylvania; see 134 A.L.R. 521, 522; Kentucky Utilities Co. v. Sutton's Adm'r, 237 Ky. 772, 36 S.W. 2d 380 (1931); Adams v. United Light, Heat & Power Co., 69 Pa.Super. 478 (1918).