**Decided June 11, 1981**

145

IN THE DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS

| | |
|---|---|
| CONSUELO T. SAN NICOLAS<br>and RAMON SAN NICOLAS,<br><br>        Plaintiffs,<br><br>      vs.<br><br>GOVERNMENT OF THE COMMON-<br>WEALTH OF THE NORTHERN<br>MARIANA ISLANDS, VENUSTO<br>ARIZAPA, and LUCIA VILLAGOMEZ<br>a/k/a LUCIA ARIZAPA and<br>ARIZAPA'S LAUNDROMAT,<br><br>        Defendants. | CIVIL ACTION 79-0051<br><br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

This cause came on for trial and was tried on February 2-6, 1981, on the issue of liability before the Court sitting without a jury. Mr. Russell E. Weller, Jr. appeared as counsel for plaintiffs, Mr. James S. Sirok appeared as counsel for the co-defendant, the Government of the Northern Mariana Islands, and Mr. Ramon Villagomez appeared as counsel for the defendants Venusto and Lucia Arizapa.

Having reviewed the testimony of the witnesses and the documents admitted into evidence at trial, all memoranda and briefs submitted herein, the Court hereby makes the following Findings of **Fact,** and therefrom, the following Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure. Any findings of fact equally applicable as a conclusion of law is hereby adopted as such and conversely any conclusion of law applicable as a **finding of fact is** adopted as such.

146

## FINDINGS OF FACT

1. The defendant GNMI, through its Public Works Department, at all times herein mentioned was engaged in the operation of transmitting and selling electricity to residents of Tinian.

2. In the course of engaging in the above-said activity, GNMI had sole and exclusive custody and responsibility for the care and maintenance of transmission lines, power poles, transformers, and other instrumentalities of the electric power distribution network on the island of Tinian.

3. The defendants Venusto and Lucia Arizapa, husband and wife, along with Edward Villagomez, brother of Lucia Arizapa, and other family members were the owners of the laundromat. Venusto and Lucia Arizapa, however, managed and operated the laundromat which was located in San Jose, Tinian, during the period involved herein. The building which housed the laundromat was built by Lucia Arizapa's two brothers and her husband. From these facts, the Court finds that the defendants Venusto and Lucia Arizapa, along with their family members, owned the building which housed the laundromat.

4. The electrical wiring within the laundromat was installed by Mrs. Arizapa's brother Edward Villagomez with the help of Venusto Arizapa. Upon completion of the wiring Villagomez, on behalf of the owners, contacted the Public Works Department in Tinian sometime in February and requested that power be hooked up.

5. The internal electrical circuitry in the building, including installation of the proper ground in the main service box (panel-board) and the meter base, is the sole responsibility of the owner of the building.

147

6. The day before the electricity was connected, the linesman for the Public Works in Tinian, Oscar King, went to the laundromat to see if the line between the "weatherhead" (the point where the electricity from the power pole is connected to the building) and the meter base was properly connected.

Oscar King noticed that the ground from the meter base to earth was missing and mentioned it to Villagomez and Mr. Arizapa. Villagomez asked King as a favor, to install the ground for him because he was leaving that day for Guam. King replied that Villagomez should check with his supervisor, Al Fleming, first before King could install the ground. Villagomez did not contact Al Fleming and did not install the ground before he left for Guam. (Fleming is the Public Works Officer for the island of Tinian).

7. The following day, the defendant GNMI through its employee, Oscar King, made the hookup from the power pole to the weatherhead, furnished to the Arizapas electricity to be used in their laundromat, as well as to an adjoining house (Castro's). The electricity furnished consumers was distributed through four transmission lines, three lines being the "hot wire", and one line being the ground wire. Each of the "hot wire" lines carries approximately 2400 volts of electricity. The 2400 volts on each line are reduced for household consumption to 240 or 120 volts by use of transformers. At the time Oscar King hooked up the lines to the laundromat, the transformer being used was a 5 KVA transformer.

148

8. The 5 KVA transformer was attached to a "cut-out" switch. The same "cut-out" switch is in turn attached to one of the three "hot wire" lines.

9. The "cut-out" switch contained a fuse rated six (6) amperes. The purpose of the "cut-out" switch is similar to that of an ordinary house fuse, namely to prevent overloading of the transformer. When an overload occurs the fuse in the "cut-out" switch burns out and the transformer ceases to function.

10. Oscar King received complaints from the Arizapas that the 5 KVA transformer produced insufficient voltage for the laundromat.

11. Oscar King conveyed these complaints to Al Fleming. King recommended the existing 5 KVA transformer be replaced by a single 15 KVA transformer which was available at the time.

12. Al Fleming refused to use the 15 KVA transformer for the reason that he was saving it for other "big businesses."

13. Fleming, instead, instructed King to install a second 5 KVA transformer which was installed on the opposite side of the first one. The same "cut-out" switch was used for both transformers. This occurred about a month after the first transformer was installed.

14. At a later time, the 6 amperes fuse in the "cut-out" switch was replaced with a 15 amperes fuse by Oscar King after the Public Works Department was notified of a power outage by Edward Villagomez.

15. The necessary ground from the main service box inside the building to the meter base opposite the main service box on the other side of the wall was never grounded at any time prior to July 28, 1979.

16. On or about July 28, 1979 the plaintiff Consuelo T. San Nicolas was lawfully inside the laundromat doing her laundry.

17. At approximately 3:30 P.M., Consuelo San Nicolas was using a General Electric dryer located at the southwest corner of the laundromat. She was sitting at the time on a wooden bench across from the dryer, and as she stood up to check her laundry she received an electric shock.

18. The electric shock caused her to collapse on the floor and she received further electric shock when her body and arms touched the concrete floor.

19. As a result of the electric shock she had received, Consuelo San Nicolas suffered severe burns on her body.

20. As a result of the aforesaid incident, Consuelo San Nicolas' left arm was amputated.

21. On the same day (July 28, 1979), cross-claimant Lucia Arizapa, although not physically present in the laundromat, was managing and operating the Arizapa's Laundromat at the time plaintiff's injury occurred.

22. Lucia Arizapa was in her kitchen (in her home located to the rear of the laundromat) when she first heard of some commotion from the direction of the laundromat. She went out and entered the door of the laundromat nearest to her house.

23. Upon entering the laundromat, Mrs. Arizapa saw a lot of smoke inside, and attempted to turn off the breaker switch in the main service box. She was unsuccessful in her attempt due to the numbness that she felt in her legs as she reached for the switch in the main service box. She became dizzy, lost consciousness, and fell on the floor.

24. Mrs. Arizapa was rescued from the laundromat and helped into her house by one Sally Etin.

25. As a result of the aforesaid incident, Mrs. Arizapa suffered burns on her back, stomach and right thigh.

26. The floor of the laundromat was slightly wet just prior to the time of the accident.

27. The transformers installed by the Government between the transmission line and Arizapa's Laundromat were negligently connected, installed and maintained by the Government.

28. The negligent installation, connection and maintenance of the subject transformers was the cause of the transmission of excessive current to Arizapa's Laundromat on July 28, 1979.

29. The installation of a ground from the main service box to the meter base and then to earth would have prevented the surge of electricity within the laundromat and the injuries sustained by Consuelo San Nicolas and Lucia Arizapa would not have occurred. This omission was a substantial factor in bringing about the injuries complained of.

30. The Government had actual knowledge of the lack of ground at the time the electricity was connected to the laundromat. The connection of electricity to the laundromat, without the proper grounding, was also a substantial factor in causing the injuries.

31. The installation and maintenance of the electrical circuitry in the laundromat, including the lack of ground from the main service box to the meter base and from the meter base to earth, coupled with the malfunctioning of the transformers mentioned in paragraph 28 above, was the actual cause of the accident.

32. Between the time of the initial hookup of electricity to the time of the accident, the Arizapas, as part owners and operators of the laundromat, had a continuing duty of reasonable care to all their customers by insuring that the defect in the electrical circuitry of the laundromat (namely, the lack of proper ground) be remedied.

Mr. Arizapa knew, and as owners and operators, both should have known, that the ground was lacking and that under certain conditions the absence of a ground would become highly dangerous.

During the same period of time, defendant GNMI had a continuing duty of reasonable care, in view of its knowledge that electricity had been supplied to the laundromat without a ground installed to stop the supply of power to the laundromat.

The Arizapas' failure to correct their omission and the Government's failure to cut off the supply of electricity constituted a breach of their respective duties of care.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action under 48 United States Code 1694a(b), 6 Trust Territory Code §§ 251(c), 253.

2. During the trial, differing explanations were offered by experts for both sides as to how the electrical malfunction which caused the accident could have possibly occurred. There was, however, unanimous agreement among the expert witnesses that the two women would not have been injured if there had been a proper ground connection.

3. The problem that we are confronted with here is to determine which of the two defendants should be held liable for the plaintiff's injury. For the reasons that are discussed below, the Court concludes as a matter of law that the co-defendants, Mr. and Mrs. Venusto Arizapa and the Government, are jointly and severally liable for the injuries sustained by plaintiff Consuelo San Nicolas on July 28, 1979 while doing her laundry in the Arizapas' Laundromat. The Court begins its analysis with respect to the duty owned by the Arizapas to the plaintiff Consuelo San Nicolas.

153

4. The plaintiff was, without question, a business visitor at the time of the accident. Restatement (Second) of Torts (1965), which is made applicable to this jurisdiction by 1 Trust Territory Code § 103, in particular section 344 provides as follows:

> A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to
>
>> (a) discover that such acts are being done or are likely to be done, or
>>
>> (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it. (emphases added)

5. There is no question that the defendants' laundromat was a type of business premise within the purview of Section 344 of the Restatement. As such, the Arizapas, as business proprietors, were required to exercise reasonable care to insure that their customers were free from any foreseeable danger while using the laundromat. The lack of a ground was clearly a dangerous hazard to customers using the laundromat. Considering the numerous appliances, the occasional wet floors, and the use of the laundromat by the customers without the owners' constant supervision, the Arizapas owed a duty of care to their business invitees to protect them from ground fault currents. The Arizapas owed a duty to their customers, including the plaintiff, to provide a reasonably safe place while doing their laundry. Such duty includes the installation and connection of a proper ground in the building which was their responsibility as builders of the building who installed the wiring and as owners and operators of the laundromat.

154

6.  In determining whether the Arizapas breached that duty, this Court must first look at what the applicable standard of care is under the circumstances of this case. There was testimony by the Government's expert witness, Don Ho, to the effect that one of the most dangerous things known in the electrical industry practice is ground fault currents.  Mr. Ho also testified that had the main panel-board been grounded prior to the incident of July 28, 1979, the accident would not have occurred.  Even Mr. Villagomez, who is not an electrical expert by any means, recognized that a reasonably prudent electrician would not consider an electrical wiring of a house completed unless the proper grounding had been installed.  All the expert witnesses unanimously agreed that a ground connection from the main panelboard to the meter base would have been the most prudent course of action that could have been undertaken to prevent the accident.

When such testimonies are taken into account, there is no doubt that a defendant will be deemed negligent if the probability and gravity of injury to plaintiff exceeds the burden of precaution required or financial costs under-taken by defendant.  Using this "balancing test" as the applicable standard of care, the Court concludes as a matter of law that Mr. Arizapa had breached the applicable standard of care required in this case.

7.  Mr. Arizapa was present when the lack of ground was mentioned by his brother-in-law, Edward Villagomez, to the linesman, Oscar King.  While it is true that Oscar King was aware of the lack of ground, he did not agree or promise to install the ground for Mr. Villagomez or Mr. Arizapa.  Instead he returned the following day and

hooked up the electricity. Mr. Arizapa, on the other hand, had several opportunities to install the ground. He could have installed it the day prior to the electricity being hooked up by Oscar King, or any time after the hookup and up until the day of the accident. He was certainly aware of this defect in the wiring, and could have done something about it before the tragic accident occurred.[1] By failing to install the ground, defendant Mr. Arizapa breached the duty he owed to plaintiff of insuring that his laundromat had been properly grounded to protect any customer from being electrocuted.

8. While the Court finds that the lack of a ground was not the sole and independent cause of plaintiff's injuries (See Findings of Fact No. 31), it was, nonetheless, a substantial factor in bringing about the injury that befell plaintiff. For purposes of determining liability, however, the Court must determine not only whether the lack of ground was the cause in fact of plaintiff's harm, but also whether it was the proximate cause (legal cause) of the plaintiff's injury.

Proximate cause is essentially a question of whether the policy of the law will extend the responsibility for the defendant's conduct to the consequences which have in fact occurred. Prosser, Handbook of The Law of Torts § 42, at 244 (4th ed. 1971). Proximate cause is also determined in relation to the defendant's duty to the plaintiff: "was the defendant under a duty to protect the plaintiff against the event which did in fact occur"? Id. at 244. The Court

- - - - - - - - - -

[1]There was no testimony presented at the trial as to why Mr. Arizapa or Mr. Villagomez had failed to install the ground after their conversation with Oscar King. Nor was there any testimony that would justifiably excuse the "overlooking" of the missing ground for over five months.

concludes, as a matter of law, that defendant Mr. Arizapa was under a duty to protect the plaintiff Consuelo San Nicolas from the type of accident which occurred on July 28, 1979. His failure to install the ground was an abrogation of that duty and was a proximate cause of plaintiff's injury.

9.  As to the duty of the Government to the plaintiff and cross-claimant, the Court concludes as a matter of law that the Government, as supplier of electricity, owes a duty to the public to avoid creating a potential electrical hazard when it was put on notice or had actual knowledge of an existing faulty electrical condition.  Harter v. Colfax Electric Light & Power Co., 124 Iowa 500, 100 NW 508; Annot., 32 A.L.R. 2d 244, 282 (1953); Koch v. Telluride Power Co., 116 Utah 237, 209 P2d 241 (1941); Oesterreich v. Claas, 237 Wis. 343, 295 NW 766, 134 A.L.R. 499(1941).  The Government was put on notice about the absence of a ground when one of its employees visited the laundromat the day before the hook up of electricity.  Where the Government knows of such a defect, its duty is to stop and not to send its deadly current to the defective wiring of the consumer, and it is liable for injuries to person caused by breach of this duty.

10.  The Government's negligence in the connection, installation and maintenance of the transformers (Finding of Fact No. 28) was a concurring proximate cause to plaintiff's injury.  Restatement (Second) of Torts §§ 430, 433A(2), 879. There was testimony by one of plaintiff's witnesses, Magdalena Taitano, that the outlets in the store which is adjacent to the laundromat, started sparking for approximately one minute at about the same time as the sparking of the machines in the laundromat.  This phenomena was caused by

157

the sudden surge of electricity that entered the store (as well as the laundromat) when the transformers malfunctioned and were unable to reduce the current coming from the transmission lines. The same surge of electricity that caused the sparking of the outlets in the store was also what caused the sparking of the laundry machines and subsequent smoke that Magdalena Taitano saw.

11. Both the Arizapas and the Government knew or should have known that the proper ground had not been installed. The Arizapas took no action to correct their omission (i.e., failure to install the ground), and the Government similarly took no action to prevent the hookup of electricity when it was put on notice about the missing ground or to discontinue the supply of electricity so long as the improper wiring continued to exist. The omission of both parties combined to create the hazardous condition in the laundromat. The separate negligence of either party alone would not have been sufficient to cause the injuries--but combined, they set the stage for the tragic drama which occurred. For this reason the Court concludes as a matter of law that the Arizapas and the Government are jointly and severally liable for plaintiff's harm. _Carpini v. Pittsburgh and Weirton Bus Co.,_ 216 F.2d 404, 407 (3rd Cir. 1954).

12. The Court concludes from the above findings of fact (Findings of Fact 3 and 21) that the negligence of Mr. Arizapa is imputed to Mrs. Arizapa, who was engaged in a joint enterprise in the management and ownership of the laundromat. _Restatement (Second) of Tort_ sections 487, Comment a, 491(c). Even assuming that a joint enterprise did not exist between

158

Mr. and Mrs. Arizapa, the Court still concludes as a matter of law that Mr. Arizapa's negligence is imputable to his wife because under community property law, if either spouse was contributorily negligent in causing injury to the other, no recovery was permitted by the injured spouse against the third party tortfeasor, in order to prevent the negligent spouse from "profiting" by his own wrong, since the recovery would be community property.  Restatement (Second) of Torts § 487 and accompanying Comment c; Nekai v. Nekai, 4 T.T.R. 388, 391 (holding that Section 704 [of the Trust Territory Code, now renumbered 39 Trust Territory Code 103] was apparently drafted to make the law in the Trust Territory similar to the laws in the "community property states" of the United States).

Trial on the remaining question of damages is hereby set for August 3, 1981 commencing at 9:00 A.M.

DATED:  Saipan, Northern Mariana Islands this ___ day of JUNE, 1981.

ALFRED LAURETA
Judge of the above-entitled Court