The ESTATE OF Steven B. THOMPSON, Bruce Thompson and Betty Thompson, Plaintiffs-Appellants,

v.

JUMP RIVER ELECTRIC COOPERATIVE and Federated Rural Electric Insurance Corporation, Defendants-Respondents.

Court of Appeals

*No. 98–2230. Submitted on briefs February 9, 1999.—Decided March 9, 1999.*

(Also reported in 593 N.W.2d 901.)

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Michael A. Jacobson* and *B. J. Hammarback* of *Hammarback Law Offices, S.C.*

On behalf of the defendants-respondents, the cause was submitted on the brief of *Denis R. Vogel* and *Patricia M. Williams* of *Wheeler, Van Sickle & Anderson, S.C.* of Madison.

Before Cane, C.J., Myse, P.J., and Hoover, J.

CANE, C.J.   The estate of Steven B. Thompson, Bruce Thompson and Betty Thompson (the estate) appeal a summary judgment dismissing its negligence claim against Jump River Electric Cooperative and Federated Rural Electric Insurance Corporation (Jump River). As part of the judgment, the trial court denied the estate's motion for a declaratory judgment that Jump River, as principal employer/owner,[1] is vicariously liable for the death of Steven Thompson, an employee of its independent contractor, Emblom Brothers Construction Company (Emblom). On appeal, the estate argues that Jump River is vicariously liable because: (1) working with high voltage electricity is an

---

[1] Wisconsin cases use the terms "principal employer," "general contractor," and "owner" to refer to the person or entity that hires an independent contractor. *See, e.g., Wagner v. Continental Cas. Co.*, 143 Wis. 2d 379, 393, 402, 421 N.W.2d 835, 841, 844 (1988) (using "principal employer" and "owners/employers"); *Snider v. NSP*, 81 Wis. 2d 224, 231–33, 260 N.W.2d 260, 263–64 (1977) (using "owner"). Throughout the opinion, we will occasionally refer to Jump River, the principal employer that hired the independent contractor, as "the owner."

abnormally dangerous activity that imposes a nondelegable duty on Jump River to exercise a high degree of care in the transmission and distribution of electricity; (2) a contract between Jump River and Emblom created the nondelegable duty; and (3) Jump River committed affirmative acts of negligence. We reject these arguments and affirm the judgment.

## I. BACKGROUND

The facts are essentially undisputed. In October 1994, Steven Thompson, an apprentice lineman, was employed by Emblom when he was fatally electrocuted as he helped remove a utility pole carrying energized lines. A contract between Emblom and Jump River provided that Emblom would construct a three-phase overhead electrical distribution line. To maintain electrical service to customers, Jump River and Emblom also agreed to keep the lines energized during the project. Emblom agreed to remove the old poles, install new ones, and transfer the lines from the old poles to the new.

On the day of the accident, Thompson was working as a groundsman with two other crew members, lineman Jon Busse and foreman Alfred Wagner; none of the men wore protective gear that day. The accident occurred when Busse was holding a support wire attached to a utility pole. The support wire touched an energized wire, thereby energizing the wire Thompson was holding and electrocuting him. Although Thompson had received formal training as a lineman and had participated in Emblom's safety program, he was not wearing rubber gloves when the accident occurred, despite his employer's instruction to wear them that morning. Experts for both parties testified that if Thompson had worn rubber gloves, he would not have

died. Further, the experts[2] testified that when linemen follow safety precautions, the risk of injury is not extremely high because safety precautions minimize the risk of injury.[3]

The estate's complaint alleges that Jump River willfully, intentionally, and/or negligently: (1) allowed its electric distribution lines to be energized; and (2) maintained the lines. The complaint also alleges that Jump River's lines were defective and dangerous. Similar to the arguments it makes on appeal, the estate's motion for declaratory relief requested the court to declare that Jump River had a nondelegable duty because working with high voltage electricity is an abnormally dangerous activity or that the contract between Jump River and Emblom created a nondelegable duty. In response, Jump River filed a motion for summary judgment contending that there was no basis for holding it vicariously liable for Thompson's death.

In denying the estate's request for declaratory relief and granting Jump River's motion for summary judgment, the circuit court concluded that while working with high voltage electricity is an inherently dangerous activity, it is not abnormally dangerous so as to impose a nondelegable duty or to hold Jump River strictly liable. Further, it found that the contract between Emblom and Jump River did not impose a nondelegable duty on Jump River. Finally, the trial court held that Jump River committed no affirmative

---

[2] Indeed, the estate's expert agreed that if Thompson had taken safety precautions, "that is, wearing rubber gloves and not ignored what he should have received in terms of safety training . . . those two steps alone would have minimized the risk of injury or death to him."

[3] After the accident, the gloves were tested and determined to be in good condition.

acts of negligence upon which to hold it vicariously liable for Thompson's death. The estate then filed a motion for reconsideration and submitted an affidavit from its expert alleging affirmative acts of negligence. The circuit court denied the motion, and the estate appealed the judgment both denying its motion for reconsideration and dismissing its complaint. Additional facts will be set forth as necessary.

## II. ANALYSIS

We review summary judgments de novo, employing the same methodology as the trial court. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816, 820 (1987). This methodology is well-known and need not be repeated here, except to note that summary judgment is appropriate if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Section 802.08(2), STATS.; *see also M&I First Nat'l Bank v. Episcopal Homes Mgmt.*, 195 Wis. 2d 485, 496–97, 536 N.W.2d 175, 182 (Ct. App. 1995). Because the facts are essentially undisputed, we may properly determine whether Jump River is entitled to judgment as a matter of law. *See, e.g., State Bank v. Elsen*, 128 Wis. 2d 508, 511, 383 N.W.2d 916, 917 (Ct. App. 1986).

While an employee's right to recover worker's compensation benefits is the employee's exclusive remedy against his or her employer, *see* § 102.03(2), STATS., the statute does not preclude an employee from suing a tortfeasor who is not his or her employer. *Wagner v. Continental Cas. Co.*, 143 Wis. 2d 379, 385, 421 N.W.2d 835, 837 (1988). Here, the estate seeks to hold Jump River, the owner, liable. Wisconsin follows the general rule that an owner is not liable to others for the independent contractor's torts, but exceptions exist to hold

an owner liable to an independent contractor's employee. *See id.* at 388, 421 N.W.2d at 838; *see also Lofy v. Joint School Dist. No. 2,* 42 Wis. 2d 253, 263, 166 N.W.2d 809, 813 (1969). The estate makes three arguments why Jump River should be held vicariously liable, and we address each in turn.

## 1. Abnormally Dangerous Activity

The estate first contends that under *Snider v. NSP,* 81 Wis. 2d 224, 260 N.W.2d 260 (1977), and *Wagner,* Jump River has a nondelegable duty to exercise a high degree of care in the transmission and distribution of electricity because working with high voltage electricity is an abnormally dangerous activity. Jump River argues that working with electricity is not abnormally dangerous because special precautions may be taken to minimize the risk of injury. We agree with Jump River.[4]

---

[4] We reject Jump River's contention that a court should apply the six factors from RESTATEMENT (SECOND) OF TORTS § 520, when determining whether an activity is an abnormally dangerous activity to justify imposition of a nondelegable duty upon it, citing *Fortier v. Flambeau Plastics Co.,* 164 Wis. 2d 639, 476 N.W.2d 593 (Ct. App. 1991). *Fortier* discusses whether a defendant should be strictly liable for an alleged abnormally dangerous activity. *See id.* at 667–75, 476 N.W.2d at 604–08. While the estate's complaint could be read to allege strict liability in that it refers to the lines as "defective" and "dangerous," the estate does not argue strict liability on appeal. *Fortier* and the RESTATEMENT factors therefore do not apply here.

We discern no additional reason to apply the RESTATEMENT factors here. *Wagner* and *Snider* do not cite § 520, and although *Fortier* postdates those cases, subsequent Wisconsin law has applied § 520 only to determine if an abnormally dangerous activity exists to impose strict liability. *See, e.g., Grube v. Daun,*

Under the nondelegable duty exception to the independent contractor rule, a nondelegable duty may be imposed by statute, contract, franchise or charter, or common law. *See Majorowicz v. Allied Mut. Ins. Co.*, 212 Wis. 2d 513, 526, 569 N.W.2d 472, 476 (Ct. App. 1997) (citing *Brooks v. Hayes*, 133 Wis. 2d 228, 247, 395 N.W.2d 167, 175 (1986)). The nondelegable duty exception is based on the theory that certain of the principal's (owner's) responsibilities are so important that the principal (owner) should not be permitted to bargain away the risks of performance. *See id.* If the independent contractor's activity is abnormally dangerous,[5] the owner has a nondelegable duty. *Wagner*, 143 Wis. 2d at 400–01, 421 N.W.2d at 844. An abnor-

---

213 Wis. 2d 533, 544–45, 570 N.W.2d 851, 856–57 (1997); *Bennett v. Larsen Co.*, 118 Wis. 2d 681, 703, 348 N.W.2d 540, 553 (1984). The reasoning set forth in *Fitzpatrick v. US West, Inc.*, 518 N.W.2d 107, 115 (Neb. 1994), is applicable here:

> Clearly [the independent contractor's employee's] theory is based on negligence principles. However, she relies upon §§ 519 and 520 of the Restatement, *supra*, to establish a common-law basis for the existence of a nondelegable duty. Those sections of the Restatement concern strict liability. Strict liability is a doctrine that imposes liability without regard to breach of a duty. . . . To hold [the owner] strictly liable for the harm caused [the employee], it would be unnecessary to establish that [the owner] owed her a nondelegable duty. Thus, those sections of the Restatement are inconsistent with and irrelevant to [the employee's] stated theory of recovery.

In any event, the general rule is that "the transmission of electricity over high-tension power lines is not generally deemed so ultrahazardous as to warrant imposition of strict-liability standard, but rather is an everyday occurrence." *See* 27A AM. JUR. 2D, *Energy and Power Sources* § 216 at 156 (1996).

[5] The terms "extrahazardous" and "abnormally dangerous" are used synonymously in Wisconsin. *See, e.g., Wagner*, 143 Wis. 2d at 392, 401, 421 N.W.2d at 840, 844.

mally dangerous activity is one "in which the risk of harm remains unreasonably high no matter how carefully it is undertaken." *See id.* at 392, 421 N.W.2d at 840. By contrast, an activity which is inherently dangerous because of the absence of special precautions is not abnormally dangerous because one can take steps to minimize the risk of injury. *See id.* Whether an activity is abnormally dangerous presents a question of law for the court to decide. *Id.* at 402, 421 N.W.2d at 844.

We hold as a matter of law that while working with high voltage electricity is inherently dangerous, it is not an abnormally dangerous activity because special precautions may be taken to minimize the risk of injury. *See id.* at 401–02, 421 N.W.2d at 844. Thompson was not engaged in an activity in which the risk of harm remains unreasonably high no matter how carefully it is undertaken. *See id.* at 392, 421 N.W.2d at 840. For example, not only would wearing rubber gloves have prevented the accident, but mechanized equipment could have been used to remove the pole, and the pole could have been covered. Contrary to the estate's suggestion, the risk of injury need not be eliminated, just minimized. *See id.*

Nonetheless, the estate insists that *Snider* implicitly holds that working with electricity is abnormally dangerous. We disagree with the estate's reading. In *Snider*, the owner hired an independent contractor, Snider's employer, to do electrical work. *Id.* at 228–29, 260 N.W.2d at 262. Snider filed a negligence claim against the owner after he fell from a cabinet.[6] In holding that Snider's work was not inherently dangerous and in affirming summary judgment, the court stated:

---

[6] Snider fell a distance of 90 inches.

"the risk to which Snider was exposed was not related to the hazards that would be experienced in working with high voltage or working at unusual heights." *Id.* However, the court did not discuss whether the risk of harm from working with high voltage electricity could be minimized with special precautions. *Snider* does not address whether working with high voltage electricity is abnormally dangerous. Thus, we glean no such inference from *Snider*.

The estate reasons, however, that because electric utilities are held to a high degree of care, *see, e.g., Oesterreich v. Claas*, 237 Wis. 343, 349–50, 295 N.W. 766, 769 (1941), Jump River should be held liable to Thompson. We are not persuaded. The existence of a higher duty does not necessarily lead to the conclusion that working with electricity is abnormally dangerous. While high voltage electricity may be dangerous, *see Dansbery v. NSP*, 188 Wis. 586, 591, 206 N.W. 882, 883–84 (1926), the test under *Wagner* is whether the risk of injury can be minimized. Because it can, the estate's argument fails.

Finally, the estate claims that high voltage electricity is "akin" to working with toxic gases, an activity *Wagner* lists as an example of an abnormally dangerous activity. *See Wagner*, 143 Wis. 2d at 392–93, 421 N.W.2d at 840 (stating that examples of abnormally dangerous activities "would include transporting nuclear waste or working with toxic gases"). The estate places great emphasis on Jump River's expert, who compared and arguably equated the risk of injury from working with toxic gases to working with high voltage electricity. Such a comparison and equation does not supplant an analysis under *Wagner*, and those activities are merely examples. *See id.* We do not read *Wagner* to require that courts compare the similarities

and differences between the two examples *Wagner* listed, *see id.*, with the activity at issue in a particular case to determine if an activity is abnormally dangerous.

## 2. Nondelegable Duty Created by Contract

Next, the estate argues that when the accident occurred, the' distribution line construction contract between Emblom and Jump River placed the project within Jump River's possession and control, thus creating a nondelegable duty. We disagree.

A contract may impose a nondelegable duty. *See Majorowicz*, 212 Wis. 2d at 526, 569 N.W.2d at 476. The interpretation of a contract, including whether it imposes a nondelegable duty, is a question of law we review de novo. *See Edwards v. Petrone*, 160 Wis. 2d 255, 258, 465 N.W.2d 847, 848 (Ct. App. 1990). Our objective in construing a contract is to ascertain the parties' intent from the contractual language, and if the contract's terms are plain and unambiguous, we must construe the contract according to its plain meaning even though one of the parties may have construed it differently. *See Waukesha Concrete Prods. v. Capitol Indem. Corp.*, 127 Wis. 2d 332, 339, 379 N.W.2d 333, 336 (Ct. App. 1985).

The contract between Jump River and Emblom provides, in part, as follows:

Section 4. Energizing the Project.

a. Prior to Completion of the Project the Owner [Jump River], upon written notice to the Bidder [Emblom], may test the construction thereof by temporarily energizing any portion or portions thereof. During the period of such test the portion or

portions of the Project so energized shall be considered as within the possession and control of the Owner and governed by the provisions of Section 3 of this Article.

Section 4 also provides that when testing is complete, and the lines have been deenergized, the tested portions are returned to Emblom unless Jump River elects to take possession and control pursuant to Section 3. Under Section 3, Jump River may submit a written request to Emblom that possession and control of any portion of the project be delivered to it provided that Emblom has been paid at least 90% of the construction cost of such portion.

██ The estate argues that reading the contract as a whole, the only reasonable interpretation is that Sections 3 and 4 provide separate and distinct mechanisms by which Jump River could take possession and control. Under either mechanism, it contends, the allocation of the parties' risks and obligations listed in Section 3 are triggered. Even if the provisions are separate, we conclude that under the contract's plain and unambiguous language, Jump River had "possession and control" only: (1) during testing of the electrical lines after giving written notice to Emblom; and (2) if Jump River requested, in writing, to have control. As Jump River points out, there is no evidence that it was testing the portion of the line when the accident occurred or that Jump River had requested in writing that any portion of the project be within its possession and control. Thus, Jump River was not in possession and control of the project when Thompson was killed, and the estate's contractual liability argument must fail.

If the estate contends that because the contract provides for energized lines during the entire project, Jump River was in possession and control, we reject such an argument. Construing the contract in this way would render portions of the contract, including Sections 3 and 4, meaningless. We must avoid a construction rendering portions of a contract surplusage. *See Goebel v. First Fed. S&L Ass'n*, 83 Wis. 2d 668, 675–77, 266 N.W.2d 352, 356–57 (1978).

### 3. Affirmative Acts of Negligence

Finally, the estate contends that it may sue Jump River in tort because it committed affirmative acts of negligence. The estate claims that the following constitute affirmative acts of negligence: (1) committing various violations of the National Electric Safety Code (NESC), which the estate contends existed for years, including: (1) failing to (a) insulate the support wires and neutral conductor; (b) have the phase wires and neutral conductors enter a substation in the same manner; and (c) insulate the support wire Thompson was holding when he was killed; (2) negligently designing the new overhead distribution line and failing to incorporate safety precautions into the line's design; (3) allowing the support wire to hang down the side of the old pole for one or two weeks before the pole's removal; and (4) failing to remedy and take precautions against the danger these situations presented. The estate also alleges that a material issue of fact exists concerning whether Jump River knew or should have known of the dangerous safety violations.

An independent contractor's employee may receive worker's compensation benefits from the independent contractor and also maintain a tort action against the person who employs the independent contractor, the

owner, if the owner is affirmatively negligent with respect to the employee. *See Wagner,* 143 Wis. 2d at 381–82, 421 N.W.2d at 836. Whether the owner's conduct constitutes an affirmative act of negligence is a question of law. *See id.* at 402, 421 N.W.2d at 844. Affirmative acts of negligence are acts of commission or "active misconduct" creating a new risk of harm to the plaintiff. *See id.* at 389–90, 421 N.W.2d at 839 (citing W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS, § 56 at 373 (5th ed. 1984)). In contrast, acts of omission or "passive inaction or a failure to take steps to protect" the plaintiff from harm do not rise to the level of an affirmative act because the owner's inaction has made the plaintiff's situation "no worse"; rather, the owner has "merely failed to benefit him by interfering in his affairs." *See id.*

We recognize that it is not always easy to draw the line between active and passive conduct, *see* PROSSER & KEETON, *supra,* at 374, but here, Jump River's "conduct" fails to rise to the level of an affirmative act. Rather, we conclude that Jump River's alleged conduct constitutes "passive inaction or a failure to protect the plaintiff from harm." *See Wagner,* 143 Wis. 2d at 390, 421 N.W.2d at 839. Most of Jump River's potential negligence lay in its failure to discover and act regarding safety violations, and such passive inaction does not constitute affirmative acts of negligence. *See id.; see also Barrons v. J.H. Findorff & Sons, Inc.,* 89 Wis. 2d 444, 457–58, 278 N.W.2d 827, 833 (1979).

Regarding the alleged design failure, the estate argues that because the project's engineer was an agent of Jump River, Jump River committed affirmative acts of negligence by negligently designing the project and failing to incorporate safety precautions into the design. The estate asserts that the following

were design defects: (1) the pole Thompson was working on could not be tipped because of its close proximity to a substation; (2) the old pole was taller than the new distribution lines which, coupled with the pole's location, created insufficient clearance between the energized wire and the new pole. Further, it maintains that Jump River's negligent design "create[d] an extremely dangerous situation."

Jump River disputes that the project engineer acted as its agent in designing the project for replacement of lines and that the engineer worked for Power Systems, a company with which Jump River contracted to engineer the line. Thus, according to Jump River, even if the line was negligently designed, it was not negligent. Additionally, Jump River maintains that the alleged problems do not involve design, but the method of construction, which Emblom, its independent contractor, controlled. As such, Jump River maintains, it should not be held vicariously liable for Emblom's failure to take appropriate safety precautions.

■

Even assuming that the engineer was Jump River's agent, we conclude that the alleged negligent act of failing to properly design the project is not an affirmative act of negligence, but an act of omission, a "failure to protect the plaintiff from harm." *See Wagner*, 143 Wis. 2d at 390, 421 N.W.2d at 839. Thus, Jump River's passive inaction by failing to incorporate safety precautions in its allegedly dangerous design cannot render Jump River liable for Thompson's death. *See id.* (failing to take reasonable steps to protect a subcontractor's employee is not actionable).

In its reply brief, the estate argues that under the RESTATEMENT (SECOND) OF TORTS § 342 at 210, the Emblom crew was an invitee on the project; therefore,

it alleges, Jump River's negligence is "determined by whether Jump River created an unreasonable risk of harm to others." Because the estate never made this argument to the trial court or in its main brief, it is waived. *See Evjen v. Evjen,* 171 Wis. 2d 677, 688, 492 N.W.2d 361, 365 (Ct. App. 1992); *Hogan v. Musolf,* 157 Wis. 2d 362, 381 n.16, 459 N.W.2d 865, 873 n.16 (Ct. App. 1990), *rev'd on other grounds,* 163 Wis. 2d 1, 471 N.W.2d 216 (1991).

*By the Court.*—Judgment affirmed.